| 64 | | 43 |
|----|----|----|
| e215 | 10 | 77 |

# Densmore Oil Company *versus* Densmore *et al.*

1. Any persons who own property of any kind may form an association with others and sell it at any price, without regard to the original cost, if there be no fraudulent misrepresentation.

2. The vendors are not bound to disclose the profit which they may realize.

3. The vendors would not be agents or trustees in their original purchase, and there would be no confidential relation which would affect them with a trust.

4. Like other cases of vendor and vendee, they deal at arm's length; their partners are in no better position than strangers.

5. From the time persons form or begin to start such association, they stand in a confidential relation to each other, and to all others who may become members, and none of them can purchase property for the purpose of the association and sell it at an advance, without a full disclosure of all the facts.

6. Such persons must account to the company for the profits.

7. The same principle is in the law of partnership.

8. Within the scope of the partnership, each partner is agent of the others, and cannot divest himself of that character without their knowledge and consent.

9. The Act of July 18th 1863 (Mining Companies) does not require that the corporators should be subscribers to stock.

10. They need not have an interest in the company; they are mere instruments of the law for organization.

11. McElhenny *v.* Hubert Oil Co., 11 P. F. Smith 188, Simons *v.* Vulcan Oil Co., Id. 202, recognised.

January 4th 1870. Before THOMPSON, C. J., READ and SHARSWOOD, JJ. AGNEW, J., at Nisi Prius.

Appeal from Nisi Prius. In Equity: No. 21, to January Term 1866.

On the 14th of November 1865 the Densmore Oil Company filed a bill against Amos Densmore, Emmett Densmore, Jonathan Watson, Clinton Roudebush, Adolph Hugel, Elisha D. Whitney, Francis C. Lawrence and Ira Canfield—Lawrence and Emmett Densmore were not served.

The bill set out as follows, viz. :—

1. The plaintiffs are a corporation under the act relating to corporations for mechanical, &c., purposes. * * *

3. About March 1864 the defendants, Densmore, Watson, Roudebush and Canfield having acquired title to certain oil lands, &c., in Venango county and elsewhere, and believing that they could acquire rights to others, visited Philadelphia to obtain and to bring about the organization of an oil company to buy their

lands, &c., and induced the other defendants to become confede-rates with them, upon promise of a share of the profits.

4. A paper was prepared by them to procure subscriptions for stock, and after a few influential names and their own were signed for a large number of shares, it was handed about for general subscription.

5. When the paper was so handed, it was represented that the defendants who had subscribed were embarked in the enterprise, and that the prospects were flattering; that the sum necessary to purchase the lands, &c., would be $250,000, and subscriptions to that amount were required.   *   *   *

7. When certain names had been secured to the list, articles of association, dated March 31st 1864, preparatory to forming a corporation, were signed—those who signed the articles acted as agents of all the subscribers for stock.   At a meeting of the corporators, on the 21st of April 1864, the stock was divided into 50,000 shares of $10 each.   The purchase from Amos and Emmett Densmore of certain oil land, &c. (specifically mentioned), for $250,000, was approved, and the president and directors were authorized to carry it into effect.   And it was resolved that the capital stock should consist of the property authorized to be pur-chased with the improvements, they being valued at $500,000. The capital stock was directed to be issued free from further assessments.   The corporators then elected directors and officers, and resolved that "the certificates be issued in favor of the original corporators, as they may be entitled to the same, or to such parties as may appear to be entitled by allotment or sub-division of the said stock under the original corporators."   At a meeting of the directors, on the 22d of April 1864, Lawrence, one of the defendants and secretary of the company being present, a certificate required by the Act of Assembly was approved, sworn to and ordered to be filed with the auditor-general, &c.   The certificate set forth the capital as $500,000, divided into shares of $10 each, and that $5 had been paid on each share.   It was signed by Lawrence as treasurer.   There was on the minutes a statement of the allotment of the stock, and certificates were directed to be issued in conformity thereto.   The statement ex-hibited stockholders for 50,000 shares, and payments to the amount of $250,000.   Amongst others, Amos Densmore, Roude-bush, Watson, Whitney, Lawrence and Hugel appeared as holding 25,500 shares.

8. At a meeting of the directors, May 3d, a deed from Amos and Emmett Densmore, dated April 25th 1864, was accepted, and at the same meeting Lawrence reported that he had paid the purchase-money.

9. The certificate to the auditor-general that $5 had been paid

[Densmore Oil Co. *v.* Densmore.]

on 50,000 shares was not true; it was untrue that Lawrence had paid the purchase-money.

10. No money was paid by the Densmores, Watson, Roudebush, Whitney and Lawrence for the shares subscribed for by them.

11. Densmores, Roudebush and Watson, the owners of the interests conveyed by the deed of April 25th 1864, were willing to take a sum much less than $250,000; that sum was fraudulently agreed amongst the defendants to be set up as the real price and that subscriptions, which, with their own, would be sufficient to make that sum, should be obtained—those subscriptions were to pay $122,500 in cash, while the defendants would not pay anything. Whitney, Lawrence and Hugel, without paying any money, or having any interest in the land, divided amongst themselves $32,500.

12. At the date of the deed several of the properties conveyed by it did not belong to the Densmores, Watson, Canfield and Roudebush, the grantors; they had given small sums for the properties which they did own; they had no right to make a profit at the expense of the other stockholders, and were bound to disclose all the circumstances. The Densmores, Watson and Roudebush, as corporators, acted as the agents for all the subscribers and represented them as corporators. As such agents, they fraudulently bought for themselves both the rights they had acquired and those they expected to acquire, and charged a sum sufficient to cover what they had paid and an enormous profit to themselves.

The prayers were—

1. For an account of the profits, &c.

2. For payment to the plaintiffs of $5 for each of the 25,500 shares.

3. General relief.

The Articles of Association and receipt were as follows:

"Know all men by these presents, that we, Francis C. Lawrence, Jonathan Watson, Ira Canfield, Amos Densmore, Richard Levick, Adolph Hugel, Clinton Roudebush, and Robert Smith, associate ourselves together under the articles of agreement made and entered into under the provisions of an Act of the 18th day of July, A. D., 1863, entitled an Act relating to corporations for mechanical, &c., purposes, in order that we may be and remain a body corporate, under the name and style of the 'Densmore Oil Company,' for the purpose of mining for oil, and manufacturing, preparing and transporting the same to market, and of enjoying all the rights and privileges conferred by the said Act of Assembly.

"It is further agreed that the mining and manufacturing business of the said company shall be carried on on certain tracts or leases of land situated along Oil Creek, Venango county, and

[Densmore Oil Co. *v.* Densmore.]

that the business of the said company shall be transacted at the office of the said company, in the city of Philadelphia, where the corporate meetings shall be held. That the capital stock of the said company shall be $500,000, to be divided into shares at the first meeting of the said company, to be held on Thursday the 21st day of April, A. D., 1864, &c., for the purpose of organizing the same under the provisions of the aforesaid Act of Assembly, dividing the capital stock into shares, adopting by-laws for the regulation of the business of the corporation, to assess upon each share of stock such sum of money as the corporation may deem proper, &c.

"Witness our hands and seals this 31st day of March, A. D., 1864."

Signed by the persons named in the articles.

"Received of Francis C. Lawrence, Treasurer of Densmore Oil Company, two hundred and fifty thousand dollars in full, of consideration of sale of oil rights and interests in real estate, in pursuance of contract of said company with Amos and Emmett Densmore. Amos Densmore."

The Densmores and Roudebush, three of the defendants, answered to paragraphs—

3. In March 1864, the above defendants and Canfield owned the oil lands, &c., some had been so owned for more than three years, and the remainder for one year or more; no part had been purchased for the purpose of forming an oil company or disposing of it to an oil company. Amos Densmore offered to sell this property to persons in Philadelphia, amongst whom were Lawrence and Hugel, and afterwards Watson. As a result of negotiations it was determined to form a stock company based on the lands, &c., at a valuation of $250,000, the capital to be divided into 50,000 shares at $5 per share; Lawrence, Hugel and Watson were to manage the details of forming the company, perform the labor and superintend the formation. The Densmore Oil Company was accordingly formed with 50,000 shares at $10, each with $5 per share, paid in by the said properties; it was agreed by the Densmores and Hugel, Lawrence and Watson, that the Densmores should sell to the oil company the lands, &c., for $250,000—this contract was afterwards consummated by payment of the purchase-money and transfer of the property to the company. Before this time, before the execution of the agreement and before the formation of the company, it was stipulated that the Densmores, Roudebush and Canfield should receive $122,500 in cash, and 16,000 shares of stock, and that Whitney, Lawrence, Hugel and Watson should receive 9500 shares.

After the articles of association and before the final organiza-

[Densmore Oil Co. *v.* Densmore.]

tion, 24,500 shares of stock had been sold to other persons by Lawrence, Hugel and Watson without any participation by these defendants. Lawrence afterwards paid $122,500 to Amos Densmore, who after the organization received 16,000 shares of stock. The valuation of the property was reasonable; a short time afterwards $400,000 could have been got for it; these defendants had expended $100,000 in developing it, and in the machinery; the yield per day at the time was eighty barrels, worth $5 per barrel. There was no fraud nor concealment of facts.

7. In executing the articles of association these defendants acted for themselves as corporators and not as agents for any subscribers to stock.

9. The certificate to the auditor-general was true. The object was not to form a company with a money capital, but one with the lands, oil interests, &c., referred to as the capital, at a valuation of $250,000—this was understood by all who became interested; shortly after the organization the stock sold at $15 per share.

10 and 11. There was no secret agreement between the parties named in these paragraphs; the sale was for $250,000, just in the manner that sum was paid.

12. These defendants and Canfield, at the time named in this paragraph, were owners of all the property conveyed to the company. Watson had no actual interest in any of it, but held the legal title merely, of some portions. There was no fraudulent profit or fraud of any kind, neither these defendants nor Watson, as agents for the stockholders, bought any rights and charged their principals as alleged in this paragraph: the persons mentioned as subscribers never claimed or were entitled to take part in the organization, they being purchasers only, under a contract to deliver stock to them when issued.

Watson, Hugel and Whitney each filed a separate answer, covering about the same ground as the answer of the other defendants. They especially averred that they had no interest in the lands, &c.; that before any association was formed, they had been employed by the other defendants, who owned the lands, to dispose of them; that it was finally agreed that they should be sold for $250,000 to an association to be formed, the terms being that detailed in the answer of the other defendants.

A replication was filed and an examiner appointed.

The plaintiffs examined Amos Densmore, one of the defendants. He testified that in February or March 1864, he came to Philadelphia to dispose of the oil lands, &c., saw Lawrence and Hugel, and offered to sell the property, not including that belonging to Roudebush and Canfield, for $150,000, if the amount of stock to be retained by Densmore, should a company be formed, could be agreed upon. Afterwards Canfield and Roudebush applied to Densmore to have their property sold with his, and he told Law-

[Densmore Oil Co. *v.* Densmore.]

rence and Hugel that they could have the whole for $122,500 cash and 16,000 shares of stock in a company consisting of 50,000 shares. After some negotiation it was arranged that a company should be formed with the property at $250,000 as the capital— the owners of the property to have cash and stock as above stated. Densmore received the $122,500 from Lawrence, and the deed was executed and delivered; $250,000 was a low price for the property, as such property was then selling. The stock was to be disposed of at $5 per share. The vendors were to receive $122,500 in cash, the proceeds of sale of 24,500 shares, and 16,000 shares of stock. Lawrence, Hugel, Watson and Whitney were to receive the remaining 9500 shares for their services in forming the company and disposing of the stock.

The certificate to the auditor general, given in evidence, recited the articles of agreement as above given, that the capital stock amounted to $500,000, divided into 50,000 shares of $10 each, and that $5 per share had been paid in; that the company had been organized on the 21st of April 1864; Aaron S. Lippincott elected president, James M. Crossman, Oswald Jackson, Joseph B. Alte-mus, John Potter and Richard Levick, directors, and Francis C. Lawrence, treasurer. The certificate was signed by all these offi-cers, except Levick, and sworn to by them May 3d 1864. The subscription list, as recorded on the company's minutes, is that mentioned in the bill.

By the defendants' evidence, it appeared that none of the per-sons who took stock signed any subscription paper, but that they agreed verbally with Lawrence, Hugel, &c., generally with Law-rence, to take stock; it was sometimes placed on a list, some-times noted on a slip of paper by Lawrence, &c. Lawrence and his associates did not subscribe for any stock, but the certificates, by the direction of Densmore, were issued directly to them. Whitney and Lawrence were partners as commission merchants; their reputation for getting up companies was very high. Oil properties of great value could not be disposed of in any other way than by forming a company; the Densmore properties were considered very productive and of very great value.

There was much other evidence. What is here given and that stated in the opinion of the court will sufficiently exhibit the case.

Mr. Justice Sharswood, at Nisi Prius, dismissed the bill with costs.

The plaintiffs appealed, assigning the dismissal of the bill for error.

*E. S. Miller* and *Strong*, for appellants.—One who is vendor cannot act as an agent for the purchaser: Gould *v.* Gould, 36 Barb. 271; Burton *v.* Wookey, 6 Maddock Ch. R. 367. Persons acting in a confidential character cannot purchase for themselves

the property of those for whom they are acting : Sugden on Vendors, chap. 20, § 2 ; Conkey v. Bond, 34 Barb. 276 ; Remick v. Butterfield, 11 Foster (N. H.) 70 ; Fawcett v. Whitehouse, 1 Russ. & M. 132 ; Whithcote v. Lawrence, 3 Vesey 750 ; Michoud v. Girod, 4 Howard 555 ; Ex parte Lacey, 6 Vesey 626 ; Reed v. Warren, 5 Paige Ch. R. 650 ; Aberdeen Railway Co. v. Blaikie, 1 Macqueen R. 461 ; Kimmell v. Geeting, 2 Grant 128 ; Hill v. Frazier, 10 Harris 320.　A promoter of a company cannot buy land which will be needed by them and make profit on it : Bank v. Tyrrell, 5 Jurist N. S. 924 ; Hitchens v. Congreve, 4 Russ. 574.　Nor buy shares in a company at reduced rate :· Society ·v. Abbott, 2 Beav. 559 ; Beck v. Kantorowicz, 3· Kay & Johns. 230 ; Foss v. Harbottle, 2 Hare 488 ; Frazer v. Jones, 5 Id. 475 ; Gaskell v. Chambers, 26 Beav. 360 ; McElhenny v. Hubert Oil Co., 11 P. F. Smith 188 ; Simons v. Vulcan Oil Co., Id. 202.　It would not be equitable to rescind the contract, for this would destroy the company ; relief therefore will be given in some other form : Lewin on Trusts 468 ; Bradley v. Bosley, 1 Barb. Ch. R. 125 ; Jones v. Shackleford, 2 Bibb 412 ; Fisher v. Kay, Id. 434 ; Woodcock v. Bennett, 1 Cowen 711.

*C. M. Husbands* and *B. H. Brewster* (with whom was *W. L. Hirst*), for appellees.—The owners not having purchased the property for the use of the company, could sell for such price as they could get : Bank of London v. Tyrrell, 5 Jurist (N. S.) 927 ; The Great Luxembourg Railway Co. v. Magnay, 25 Beav. 586 ; Foss v. Harbottle, 2 Hare 489 ; Lindley on Partnership 481.

The opinion of the court was delivered, January 10th 1870, by

Sharswood, J.—There are two principles applicable to all partnerships or associations for a common purpose of trade or business, which appear to be well settled on reason and authority.

The first is, that any man or number of men, who are the. owners of any kind of property, real or personal, may form a partnership or association with others, and sell that property to the association at any price which may be agreed upon between them, no matter what it may have originally cost, provided there be no fraudulent misrepresentation made by the vendors to their associates.　They are not bound to, disclose the profit which they may realize by the transaction.　They were in no sense agents or trustees in the original purchase, and it follows, that there is no confidential relation between the parties, which affects them with any trust.　It is like any other case of vendor and vendee.　They deal at arms length.　Their partners are in no better position than strangers. They must exercise their own judgment as to the value of what they buy.　As it is succinctly and well stated in Foss v. Harbottle, 2 Hare 489, " A party may have a clear right to say, I begin the

transaction at this time. I have purchased land, no matter how or from whom, or at what price. I am willing to sell it at a certain price for a given purpose." This principle was recognised and applied by this court in the recent case of McElhenny's Administrators *v.* The Hubert Oil Co., decided May 11th 1869 (11 P. F. Smith 188). " It nowhere appears," said the present Chief Justice, " that McElhenny, the purchaser from Hubert, the original owner, did it as the agent of Messrs. Baird, Boyd & Co. and others, though he bought it to sell again, no doubt; he had a perfect right, therefore, to deal with them at arms' length, as it seems he did." And again: " If the property was not purchased by McElhenny for the use, and as agent for the company, but for his own use, he might sell it at a profit, most assuredly. No subsequent purchasers from his vendees would have any right to call upon him to account for the profits made on his sale." In that case, McElhenny, being the owner of property which had cost him only $4000, sold it to Baird, Boyd & Co., and others, who associated with him to form an oil company for $12,000, and it was decided that the company could not call him in equity, to account for the profit he had made.

The second principle is, that where persons form such an association, or begin or start the project of one, from that time they do stand in a confidential relation to each other, and to all others who may subsequently become members or subscribers, and it is not competent for any of them to purchase property for the purposes of such a company, and then sell it at an advance without a full disclosure of the facts. They must account to the company for the profit, because it legitimately is theirs. It is a familiar principle of the law of partnership, one partner cannot buy and sell to the partnership at a profit; nor if a partnership is in contemplation merely, can he purchase with a view to a future sale, without accounting for the profit. Within the scope of the partnership business, each associate is the general agent of the others, and he cannot divest himself of that character without their knowledge and consent. This is the principle of Hichens *v.* Congrove, 4 Russ. 562, Fawcett *v.* Whitehouse, 1 Russ. & M. 132, and the other cases which have been relied on by the appellants. It was recognised in McElhenny's Admin'rs. *v.* The Hubert Oil Co., just cited; and also in Simons *v.* The Vulcan Oil Co., decided by this court, May 11th, 1869 (11 P. F. Smith 202). Both of these cases were complicated with evidence of actual misrepresentations as to the original cost of the property to the vendors. In the opinion of the court in the last case, delivered by Thompson, C. J., it is said : " If the defendants in fact, acted as the agents of the company in acquiring the property, they could not charge a profit as against their principal. Nor was their position any better if they assumed so to act without precedent authority, if their doings

[Densmore Oil Co. *v.* Densmore.]

were accepted as the acts of agents by the association or company. If, in order to get up a company, they represented themselves as having acted for the association to be formed, and proposed to sell at the same prices they paid, and their purchases were taken on these representations, and stockholders invested in a reliance upon them, it would be a fraud on the company, and all those interested, to allow them to retain the large profits paid them by the company in ignorance of the true sums actually advanced." The defendants in that case were subscribers with others, to the stock of a projected oil company, and after the plan had been formed, secured to themselves by contract, the refusal of the property which they afterwards sold to the company at a greatly advanced price.

The question now presented is, under which of these two principles is the present case to be classified. That will depend upon the facts, which, though the testimony is somewhat voluminous, may be briefly stated. Densmore, Roudebush and Canfield, three of the defendants, were the owners of certain lands, leases and rights, in Venango county, in the oil region. They had acquired them, so far as appears, with no idea of disposing of them, or of forming a company, but had spent over $100,000 in improving and developing them while they were owners. In March, 1864, they came to Philadelphia to ascertain whether they could be sold to advantage. They called upon Mr. Lawrence, another of the defendants, and consulted him as to the best mode of effecting this object. They stated that they were willing to accept $202,000, provided that sum could be procured clear of all expenses. That seemed impossible, unless by naming a price so much beyond that sum as would cover all such probable expenses and contingencies. The only mode by which so large an amount could be realized, was by the organization of a stock company, and to do that effectively persons must be employed as agents to sell or solicit subscription to the stock; and they must be gentlemen of character and influence, well acquainted with the subject, who could bring the land to the notice of those desirous of engaging in such an enterprise. The amount to be raised was large; the result uncertain. Several agents must be employed, and their compensation must be at a liberal rate. It was arranged that the price should be fixed at $250,000; that the stock should be 50,000 shares at $10 a share, and $5 to be paid in cash. Mr. Densmore and his associates agreed to take $122,500 in money, and the balance in stock, and that from this stock they would compensate the agents for their services. Mr. Densmore, who was examined as a witness on behalf of the appellants, testified: "The $122,500 was the proceeds of the sale of 24,500 shares. That added to the 16,000 shares we were to get, amounted to 40,500 shares. The arrangement as I understood it was, that Messrs. Lawrence, Hugel, Wat-

[Densmore Oil Co. *v.* Densmore.]

son, and perhaps parties unknown to me, were to receive the balance of the stock for their services in forming the company, and disposing of the stock." The gentlemen named were accordingly engaged for this purpose. They proceeded and did sell the 24,500 shares in order to make the cash payment. There was no sub-scription paper. Mr. Lawrence and his associates did not subscribe for any stock. They did not appear, and were not held out as subscribers to those who made purchases from them. It is true, that after the company was organized, the stock which they were to receive from Densmore, Roudebush and Canfield, as a compensation for their services, was issued to them directly—not to the vendors, and by them transferred. But this was done by a special order, as is satisfactorily explained in the testimony of E. B. Schneider: "I heard Mr. Densmore request Mr. Lawrence to have the Densmore stock, which he (Mr. Lawrence), Watson, Hugel and Whitney, were entitled to, issued direct to themselves, as he might not be here when the certificates would be ready." It has not been, and cannot be controverted, that the stock which they received was part of that, which under the original terms of sale, Densmore, Roudebush and Canfield, were to have in payment of the purchase-money.

Now it can hardly be questioned, and indeed, apart from their alleged liability as confederates with the other defendants, it has not been questioned, that Densmore, Roudebush and Canfield, fall within the first principle hereinbefore stated. They had, for a considerable time, been the owners of the property, had acquired it with no reference to the formation of this or any other company, and had improved and developed it by a very large outlay of their own capital. They had a clear and undoubted right to put their own price upon it in the formation of a company, in which they were to be partners or associates. They did put upon it the price of $250,000, which *it is* admitted at the rates at which such property was then selling in the market, was a fair and reasonable, nay, even a low price. "From my knowledge of mining properties in the oil region at the time," said N. B. Browne, Esq., in his testimony, " and especially of the leasehold and other interests conveyed to this company, I regarded their interests at the price named, $250,000, as cheaper than any that were offered in this market. Their actual productive value was very great; the leases were on what was regarded as the best territory on Oil Creek." Had Messrs. Densmore, Roudebush and Canfield, employed no agents, but sold all the stock themselves, the transaction as to them could not have been impeached. They certainly stood in no confidential relation to the subscribers or purchasers of the stock in the future, when they acquired the property. This is necessary, as we have seen. A company or partnership must have been then formed or forming, or at least the project must have been started,

[Densmore Oil Co. *v.* Densmore.]

in order that any confidential relation should arise.   How then is their position varied by the fact that they employed agents and agreed to compensate these agents by a transfer of a certain part of the stock they were to receive ?   It is not easy to see.   The whole $250,000, money and stock, when received, was their own absolute property : they could give or transfer it to whomsoever they pleased.   If, as we have seen, they stood in no confidential relation to the company, no trust could attach to the price or any part of it in their hands.   We may dismiss, therefore, the case of Messrs. Densmore, Roudebush and Canfield, as clearly within the first principle to which we have before adverted.

But what confidential relation did the other defendants sustain to the purchasers of the stock or to the company ?   It is a clear and unquestionable fact in the cause that they did not subscribe for a single share.   Their contract was with Densmore, Roudebush and Canfield, to receive from them a part of their stock. Without an order from them, Mr. Lawrence and the others could not have compelled the company to issue any of it to them.   If Densmore, Roudebush and Canfield, had received all the certificates to which they were entitled, and then refused to transfer, the only remedy of Messrs. Lawrence and others, would have been against them to recover damages for violation of their contract.   It is clearly proved that the paper among the exhibits headed " Subscription List to the Densmore Oil Company," was made out by Mr. Lawrence after the organization as a list of those to whom certificates of stock were to be issued.   The names of Lawrence, Whitney, Watson, and Hugel, appeared on that list, but clearly only as appointees or assignees of Densmore, Roudebush, and Canfield.   The same appointment or order might have been given by them to mere strangers.

It is strenuously contended, however, that if these defendants did not stand in a confidential relation to the purchasers of stock, then there was nobody who stood in that relation.   But is there anything extraordinary in that ?   Nine-tenths of the transactions and contracts of life are at arms' length.   If a man buys stock in the market of a broker, there is nobody who stands in any fiduciary relation to him.   He acts on his own judgment   He is bound to pay the broker the price agreed, and the broker is bound when paid to deliver him the stock.   This was the only relation in which Lawrence, Whitney, Hugel and Watson stood to those who bought stock from them, and who according to all the testimony in the cause, so understood it.   They supposed, as they state, that these gentlemen were to receive compensation for their services.   What it was to be they did not inquire, because it was none of their business.

A strong effort, however, has been made, to show that these

defendants, Lawrence, Whitney, Watson and Hugel, were purchasers from Densmore, Roudebush and Canfield, of an interest in the property, and sold it at an advance. But of this there is not a spark of evidence. It can hardly be pretended that Densmore, Roudebush and Canfield, could have held them liable on a contract to purchase any interest in the land, or that the agents could in any event have sued them for not conveying to them such interest. If this was so, how can it be contended that they were vendors of any part of the property to the company?

Densmore, Roudebush and Canfield were first and last the only vendors. They executed the deed, and very properly receipted for the whole of the purchase-money, for they were entitled to the whole of it. Nor is the fact that Lawrence, Whitney, Watson and Hugel, joined with Densmore, Roudebush and Canfield, as original corporators, and signed the articles for the organization of the company, under the Act of July 18th, 1863 (Pamph L. 1864, p. 1102), a fact of any significancy. That act does not require that the corporators should be subscribers to stock. They need have no interest whatever in the company to be formed. They are mere instruments of the law for purposes of preliminary organization. The moment that is accomplished, the amount required as capital paid in, the necessary certificate signed, and the charter granted, they are *functi officio*. The corporation is thenceforth composed of the stockholders.

It is supposed that the cases of McElhenny's Administrators *v.* The Hubert Oil Co., and Simons *v.* The Vulcan Oil Co., before referred to, ought to rule this cause. But an examination of the opinions in those cases will show that the facts upon which they were decided, were entirely different from those which appear on this record. The defendants there were subscribers to the stock; they became purchasers of the property after the project of a company was started, and moreover, falsely represented that they had purchased it at the same price at which they sold.

These facts, which were the grounds upon which those determinations were based, are not, as we have seen, the facts of this case. It is not pretended that any false representation was made by any of these defendants in the sale of the stock. Some other points have been raised, which are, however, sufficiently disposed of in the opinion below.

> Decree affirmed and appeal dismissed at the costs of the appellants.