# I. J. RINGOLSKY, Appellant, v. THE MAUD L. MINING COMPANY et al.

## In Banc, December 1, 1914.

1. **CORPORATIONS: Formation: Partnership Relation Between Organizers: Must be Established by Proof.** Promoters of a corporation are not prima-facie partners. Their partnership must be established by proof.

2. ———: ———: ———: ———: **Evidence.** Where R, T, and G, with others, formed a corporation, each putting in mining property and taking in return stock and bonds of the corporation, evidence *held* not to show that R and T were partners.

3. ———: ———: **Promoters: Secret Profits.** T, G, and G's associates owned four mines. In May, 1905, the plaintiff and M. I. bought an interest in two of the mines, and on July 9, 1905, G offered to sell his interest and that of his associates to the plaintiff and T for $257,000. They agreed to buy, and a week later the plaintiff, with T and M. I., drew up a contract providing for the formation of a corporation to take over the mines, M. I. to advance $50,000 and to hold stock as security until G was fully paid, the plaintiff and T to transfer to the corporation all their interest in the mines. T was to receive one-half, and the plaintiff and M. I. each one-fourth of the issued stock. In August, 1905, the plaintiff, G, and M. I., with M. I.'s associates, Bendet Isaacs, Adolph Eliasberg and the two Rosenwassers, entered into an agreement to form the corporation with a capital stock of 2,500,000 shares, par value $1 each. M. I., the Rosenwassers, and Eliasberg were to pay G an additional $50,000, and for the $100,000 total thus paid they were to receive $1,000,000 in bonds and 500,000 shares of stock in the new corporation. Bendet Isaacs was to pay $33,333.33 into the treasury and receive the same amount in bonds and 166,666 shares of stock, the stock to be taken out of the holdings of the plaintiff and T. For the additional $157,000 due him G agreed to take $100,000 in bonds, a vendor's lien for $57,000 and 100,000 shares of stock, the bonds to be the first paid by the company and the earnings to be applied to paying off the vendor's lien. T did not sign this agreement, and when in September, 1905, he made several objections to its consummation in that form certain concessions were made to him, and finally G told him he believed the stock he (T) would

262 Mo.16

get would be worth as much as his (G's) bonds, and agreed to let him, at any time he might wish, take a part of the bonds in exchange for a proportionate share of T's stock. With this understanding between them, undisclosed to the others, the agreement was closed substantially on the contract basis. Afterwards there was drawn and signed a declaration of trust, wherein it was declared that G and T jointly owned the stock and bonds acquired by each. Later both G and T disposed of all their stock and bonds to another corporation. *Held*, in plaintiff's suit for secret profits alleged to have accrued to T by reason of his undisclosed agreement with G, that there can be no recovery, even assuming that T was a promoter and that the plaintiff has the right to sue on behalf of the company after parting with his stock.

Appeal from Jasper Circuit Court.—*Hon. Joseph D. Perkins,* Judge.

AFFIRMED.

*New & Krauthoff* and *McReynolds & Halliburton* for appellant.

(1)   The arrangement between Tobias and Ringolsky, outlined in the contract of July 10, 1905, created a partnership between the parties named. This being true, Tobias could not, at the expense of Ringolsky, make any contract with Gundling whereby Gundling, the owner of the property being purchased by the partnership, should pay to Tobias, a member of the partnership, a part of the purchase price received by Gundling. Whatever Tobias did thus receive from Gundling would belong, in equity, one-half to Ringolsky. Pomeroy v. Benton, 57 Mo. 544, 77 Mo. 64; Whitney v. Dewey, 158 Fed. 391; Filbrun v. Ivers, 92 Mo. 388; Burgess v. Dierling, 113 Mo. App. 383; 30 Cyc. 419, 438; 38 Century Dig. 783, 784 and authorities cited; Flower v. Barnekoff, 20 Ore. 132, 11 L. R. A. 149; Tyler v. Waddingham, 58 Conn. 375, 8 L. R. A. 657, and note; 22 Am. & Eng. Ency. Law, p. 114. Even if the relation between Ringolsky and Tobias was not technically that one of a partnership, the principle con-

tended for applies to all instances where persons are jointly associated in a common enterprise. Trust & Guar. Co. v. Hambleton, 34 Md. 456, 40 L. R. A. 216; Ferguson v. Gooch, 94 Va. 1, 40 L. R. A. 234; Kimberly v. Arms, 129 U. S. 528; Williamson v. Monroe, 101 Fed. 322; 2 Bates on Partnership, sec. 790; 15 Decennial Digest, pp. 1118, 1119, Partnership, sec. 97; Pratt v. Frazer, 129 S. W. (Ark.) 1088; Davenport v. Bank, 128 S. W. (Ky.) 88; White v. Jouett, 144 S. W. (Ky.) 59. (2) If it be contended that the original relationship existing between Tobias and Ringolsky, that of a partnership or joint association in a common venture, was changed by reason of the transactions had in New York in the latter part of September, 1905, then the result follows that at the time and place named Tobias was the promoter of a corporation and could not, at the expense of the corporation, make a secret profit for his own benefit out of any transaction he had with Gundling. In other words, eight men were sitting in a room engaged in the promotion of a corporation. All eight were directors of the corporation. Four of the eight were interested in selling the property to the corporation. One of the four selling, objected to the terms of the sale. Thereupon, another of the four selling, took the former out of the room and made an agreement with the former whereby the first named director was given an interest in that which the second named director was receiving from the corporation in which both of them were directors. In the law of promoters, it was required that when Gundling and Tobias left the room and made the agreement which both of them admit was made, Tobias, should have returned to the room and advised his associates of the concession that Gundling was willing to make, and such concession so made inured to the benefit of the corporation as a whole and not to Tobias as an individual. Land Co. v. Case, 104 Mo. 578; Seehorn v. Hall, 130 Mo. 261; Land & Imp. Co. v. Web-

ster, 75 Mo. App. 465; 10 Cyc. 274; Yeiser v. Board & Paper Co., 107 Fed. 340, 52 L. R. A. 727; Dickerman v. Trust Co., 176 U. S. 203; Telegraph Co. v. Lotscher, 127 Iowa, 383; C. M. & S. Co. v. Bigelow, 203 Mass. 159; 2 Cook on Corporations (6 Ed.), sec. 643; 1 Clark & Marshall on Priv. Corp., sec. 110; 1 Mechem on Modern Corporations, sec. 377; 1 Thompson on Corporations (1 Ed.), sec. 457. (3) By a declaration of trust executed in April, 1906, and by the agreement made by Gundling with Tobias in New York in September, 1905, Gundling made of himself a trustee, in his own wrong, and held in trust either for the corporation or the partnership, as the case may be, the profit which Tobias was seeking to gain in the stock and bonds in the possession of Gundling. Howell v. Howell, 15 Wis. 55; Shaler v. Trowbridge, 28 N. J. Eq. 595; Partridge v. Wells, 30 N. J. Eq. 178; Renfrow v. Pearce, 68 Ill. 126; Forney v. Adams, 74 Mo. 138; Croughton v. Forrest, 17 Mo. 131; Ackley v. Stachlein, 56 Mo. 561; Blake v. Bank, 219 Mo. 644; Price v. Hunt, 59 Mo. 258; Evans v. Gibson, 29 Mo. 223; Koch v. Branch, 44 Mo. 542.

*Henry Russell Platt* and *Spencer, Grayston & Spencer* for respondents.

BLAIR, C.—Plaintiff appeals from a judgment for defendants in a suit to recover secret profits alleged to have been realized by defendant Tobias in connection with the sale of mines to a corporation, the defendant Red Top Zinc & Smelting Company. Upon grounds hereafter stated other defendants are alleged to have become liable. The mining properties involved were the Maud L., the Cumberland, the Ada B., and the Oronogo, all in Jasper county.

In 1905 defendants Tobias and Gundling each owned a one-half interest in the first two, and Tobias owned one-fifth and Gundling and certain associates

owned four-fifths of the others. In May or June, 1905, plaintiff and Moe A. Isaacs jointly purchased a one-fifteenth interest in the Maud L. and Cumberland, Tobias and Gundling each retaining a seven-fifteenths interest therein. In May, 1905, these latter applied to plaintiff for a loan. Plaintiff proposed to form a corporation to take over the properties and borrow $30,000, plaintiff offering to accept the corporation's note for $5000 and one-fourth of the capital stock for his services in securing the loan, urging that his connections were such that his name would give great prestige to the enterprise. This suggestion was not adopted. Gundling concluded to sell his interests and, July 9, 1905, offered them to Tobias and plaintiff for $257,000, plaintiff to receive $33,000 additional for his compensation in negotiating the sale. Plaintiff and Tobias agreed to buy and a week later visited New York and they and Moe Isaacs drew up a contract providing for the formation of a corporation to take over the mines. Isaacs agreed to advance the company $50,000, holding the stock as security until Gundling was fully paid, plaintiff to perform all legal services and Tobias to transfer to the corporation his interests in the mines. It was agreed that Gundling should be paid $257,000 for his interests and those of his associates in the Ada B. and Oronogo and that Tobias should receive one-half and plaintiff and Isaacs, each, one-fourth of the issued stock.

Previous to the execution of this contract plaintiff and Tobias signed an agreement and executed certain notes to secure Isaacs from loss in case he signed the contract, and to secure him for money advanced if he concluded not to sign it.

Plaintiff and Tobias returned to Missouri, and Gundling expressed no dissatisfaction with the contemplated arrangement. It did not modify the terms of the contract of July 10, 1905, in so far as it concerned Gundling.

Moe A. Isaacs and his associates sent an expert to Missouri who examined the mines and reported thereon. His expenses were subsequently paid by plaintiff and Tobias. Concerning this plaintiff wrote Tobias: ''I note everything you say and every sentiment and feeling expressed by you I coincide with and have felt myself. I think it was an outrageous proceeding to send an expert to Joplin at our expense at a cost of $1000, and when I see Moe he will find that things will have to be entirely changed or I will end the contract in New York. I am tired of the imposition and the entire situation.'' In the same letter, dated July 28, 1905, plaintiff wrote: ''I will see that we have an opportunity to discuss everything before I undertake to make any changes in the agreements we made.''

Installments falling due under the contract of July 10, 1905, aggregating $50,000, were paid Gundling, Moe A. Isaacs and his New York associates advancing the money.

About the last of August, 1905, plaintiff and Gundling visited New York. Associated with Moe A. Isaacs were Bendet Isaacs, Adolph Eliasberg, Morris Rosenwasser and Harry Rosenwasser, and these and plaintiff and Gundling entered into an agreement August 29, 1905, which recited the fact that Gundling had contracted to sell the properties to plaintiff and Tobias for $257,000; that all the parties (including Tobias) had become interested in financing the properties; that Gundling had been paid $50,000, furnished by Moe A. Isaacs, the Rosenwassers and Eliasberg; that it was then agreed plaintiff was to form a corporation, the Red Top Zinc & Smelting Co., with a capital stock of $2,500,000, par value of shares $1 each; that each of the four mines involved was to be incorporated, the stock to be held by the Red Top, etc., Company, and therefore it was agreed that:

Moe Isaacs, the Rosenwassers and Eliasberg were to pay Gundling an additional $50,000, and for the $100,000 paid were to receive $100,000 in bonds and 500,000 shares of stock of the new company. Bendet Isaacs was to pay $33,333.33 into the company's treasury and receive $33,333.33 in bonds and 166,666 shares of stock, this stock to be given out of the holdings of plaintiff and Tobias.

Seven thousand and five hundred dollars in cash was to be paid by the company to Moe A. Isaacs for the money he had invested in the mines; 500,000 shares of stock to remain in the treasury.

For the additional $157,000 due him Gundling agreed to take $100,000 in bonds and a vendor's lien for $57,000 and 100,000 shares of stock, the bonds to be the first paid by the company, and Gundling to take $57,000 from the earnings to pay off the vendor's lien.

The new company was to issue bonds for $233,000, bearing 7% interest; no dividends to be paid until bonds were paid, and the $57,000 secured by vendor's lien to be paid in advance of payment of the bonds; the new company to own a one-half interest in the Galena mines. There were other provisions which need not be set out.

This agreement was signed by all the persons named above except Tobias, who was not present. Plaintiff wired Tobias stating the salient features of the new agreement and closing: ''Wire if you can make contract embodying these terms generally.'' The following day the plaintiff received a telegram from Tobias asking if working capital would be furnished. Without further authority plaintiff signed the name of Elias Tobias to the agreement. Plaintiff did not see Tobias again until another meeting was had in New York in the latter part of September, and there is no evidence Tobias ratified plaintiff's action in signing the agreement for him. On September 15th Tobias wrote plaintiff objecting to certain features of the

agreement, particularly to the inclusion of the Galena property and to the fact that the dividends he was to get were to be small and postponed for some time. In this letter he neither said he would nor that he would not accept the agreement as made, modified in the particulars mentioned. He complained he was "doing more than his part in the transaction."

At the meeting in New York, September 29 and 30, 1905, Tobias made several objections to the written agreement. He demanded that the Galena mine be left out, that a note of his to Moe A. Isaacs be paid by the new company, objected to giving up part of his stock to Bendet Isaacs and to Gundling and complained he was putting in unencumbered interests and getting only encumbered interests. He indicated he would not go further with the matter. It was finally agreed the Galena property should be omitted and that the company should pay the $2500 note. This left the matter of the transfer of part of Tobias's stock to Bendet Isaacs and Gundling. The negotiations seem to have been conducted at a series of conferences in which sometimes all and at times only two or three participated. Gundling had been paid $50,000 in cash and had paid this out. He became worried lest the position Tobias took would result in the abandonment of the whole undertaking, in which event he would have to repay the $50,000, which he was not in a position to do. Gundling finally took Tobias aside and told him the situation he would be in if the matter was dropped and stated he believed that if it was closed up the stock Tobias would get would be worth as much as the bonds he (Gundling) would get, and offered to permit Tobias to take a part of the bonds in exchange for a proportionate part of the stock Tobias would get. With the understanding he could do this if he desired, Tobias agreed to go on with the business. The matter was then closed up, practically on the contract basis, except insofar as the concessions to Tobias modified it.

Nothing was said to the others, so far as the evidence shows, by Tobias or Gundling about the agreement they had made.

The net result was that the new company secured the full title to the four mines, subject to a vendor's lien for $57,000 and a deed of trust securing bonds amounting to $233,333, and had $23,300 in the treasury. Gundling received $100,000 in cash, $100,000 in bonds and 100,000 shares of stock. Tobias received 822,224 shares of stock and plaintiff 411,220 shares. Moe A. Isaacs, Bendet Isaacs and Eliasberg each received $33,333 in bonds and 166,666 shares of stock, and the two Rosenwassers received, jointly, a like portion, in accord with the contract. Subsequently Moe A. Isaacs negotiated the sale to Gundling of the $66,666 in bonds held by the Rosenwassers and Eliasberg, retaining $3000 of them for his trouble. With these Gundling also acquired the stock of the vendors, amounting to 333,220 shares. These bonds were discounted $10,000, and Gundling procured the money to buy by borrowing a large sum from one Werner, using the $57,000 vendor's lien as collateral.

About March, 1906, Gundling conceived the idea that plaintiff and Moe A. Isaacs were scheming for control of the company. April 6, 1906, there was drawn and signed a "declaration of trust," wherein it was stated Gundling and Tobias jointly owned the $163,000 in bonds and 433,224 shares of stock Gundling had acquired and the 822,224 shares of stock issued to Tobias. This declaration was actually drawn, signed, and acknowledged April 6, 1906, but was dated August 5, 1905, for the purpose of indicating that Tobias became responsible for his one-half of certain indebtedness incurred by Gundling in connection with the various transactions prior to the actual execution of the instrument.

For one thing Gundling had paid out about $135,-000 in buying out his associates in the Ada B and Oro-

nogo mines, and, it seems, to liquidate certain indebtedness of these properties. Other facts will be referred to in the opinion.

Plaintiff contends (1) that he and Tobias were partners, or, if not, (2) that he and Tobias and Gundling were promoters, and that on either theory the judgment is wrong.

In the view taken of the case it is unnecessary to discuss the question whether plaintiff can sue on the first theory in his individual capacity and on the second in a representative capacity in the same case and on a petition containing a single count. [Turner v. Markham, 155 Cal. l. c. 569, 570.]

The actual basis of plaintiff's claim is that Tobias's stock was worth less than the stock, bonds and vendor's lien given Gundling and, consequently, the agreement between the two resulted in a profit to Tobias for which he must account either to plaintiff as his partner or to the corporation as one of its promoters. It is contended Gundling is liable by reason of having parted with Tobias's stock and bonds after notice of plaintiff's claim, and the Oronogo Circle is liable as a purchaser with notice. The other corporations are made defendants because their property may be affected and the other individual defendants are the remaining incorporators of the Red Top Zinc & Smelting Company.

I. "Partnership is a matter of contract. A man cannot be made a partner against his will, by accident or the conduct of others. He must agree to be a partner, or, as to outsiders, hold himself out as a partner to those who have trusted him as such." [Freeman v. Bloomfield, 43 Mo. l. c. 392.] There was no general partnership between plaintiff and Tobias (Whitehill v. Shickle, 43 Mo. 537) and, even if it be assumed they were promoters, prima-

*Formation of Corporations: No Partnership Between Organizers.*

facie no partnership between them existed.    [10 Cyc. 271, 272.]   The burden is still on plaintiff to make out the fact of partnership by evidence.

If this was a partnership venture, it is pertinent to inquire when the relation began.   There is nothing in the agreement Tobias, plaintiff and Isaacs signed constituting a partnership.  Plaintiff was to form a corporation and get stock for his services.   Tobias was to receive stock for his property he put in.  Neither was to receive any part of the share of the other. Plaintiff was not of the opinion he had any right to bind Tobias when he wired him asking whether he could agree to the contract of August 29, 1905.   His testimony indicates he signed Tobias's name to the agreement solely because he inferred from Tobias's reply telegram that permission was intended to be given, an inference it is not now contended can properly be drawn from that telegram.

Tobias repudiated portions, at least, of the contract of August 29, 1905.   There is no evidence any claim was then made by plaintiff or any one else that Tobias was bound by plaintiff's act in signing his name to that contract.   Nor does plaintiff now suggest that Tobias is or ever was interested in the stock he, plaintiff, received or the $10,000 he got for it.

True, plaintiff testified Tobias was his partner and Tobias testified the contrary.

The trial court did not find a partnership existed, and, on the evidence, we are not disposed to criticise the view it took.

II.   It is contended Tobias was one of the promoters of the company formed; that his relation to his associates was consequently of a fiduciary character and that his agreement with Gundling was violative of his obligation arising out of that relation; in that, it is asserted, Gundling's stock, bonds and vendor's lien were

Promoters:
Secret Profits.

worth more than the stock offered Tobias, and that Gundling, therefore, received, under that agreement, less than the other six incorporators had contracted to give for his interests; that Tobias got the difference and that this constituted a secret profit for which he should account and for which Gundling is chargeable on the theory that he had Tobias's interest in his possession with knowledge of the trust and, having parted with it, is liable for the amount of the profit Tobias is declared to have realized.

Let it be assumed that Tobias was in fact a promoter of the company and that the interest he took under the agreement with Gundling was of greater value than the 822,224 shares of stock offered in the first place for his interest in the properties. Further, let the question of plaintiff's right to sue on behalf of the company, after having parted with his stock, be waived.

The contract of August 29, 1905, modifying the contract Tobias signed July 17, 1905, was never signed by Tobias, nor did he ratify plaintiff's act in signing for him. That contract fixed the value of Gundling's interest at $257,000 and provided for paying him $100,000 in money, $100,000 in bonds, $57,000 by vendor's lien and for the issuance to him of 100,000 shares ($1 per share, par value) of stock for his interest. Plaintiff contracted to accept 411,000 shares of stock for his services. Tobias (all the others had agreed) was to receive 822,224 shares of stock for his interests in the properties. The five other than plaintiff, Tobias and Gundling were to receive bonds equaling in amount the cash each advanced and, in addition, five shares of stock for each dollar thereof. For this stock they paid nothing. The stock represented the equity in the properties. There was neither intent to sell nor sale of stock to third persons. There were no subscribers save the eight. Plaintiff's compensation was represented by the stock issued to him and

represented a fixed portion of the equity in the properties being acquired by the corporation at the prices stated in the contract. The bonuses in stock issued to Moe A. and Bendet Isaacs, the two Rosenwassers and Eliasberg were likewise issued on the basis of the equity resulting from encumbering the properties for $290,000. The six incorporators other than Tobias and Gundling received the exact amount of stock they contracted for and it represented the exact portion of the identical equity they had contracted it should represent.

The agreement between Tobias and Gundling did not affect the value of the stock of the six others in the smallest fraction. The contention made assumes, in fact, that if Gundling's interests had been acquired for less and the value of the equity had been thereby proportionately increased, the amount of the bonds being reduced, the six named would have been awarded the same proportion of the equity, plaintiff for services and the others for stock bonuses. That is an assumption, in effect, that the six had some claim outside the contract itself. That is not true in fact or in law. So far as concerns the question before us, they contracted for designated portions of an equity the contract described and each of the six received that for which he contracted. Neither can claim more. The agreement between Gundling and Tobias neither decreased nor increased the value of the equity, and, consequently, did not affect the other six.

There is no pretense there was any misrepresentation of the value of the properties. The evidence strongly tends to show that Tobias's unencumbered interests were worth as much as Gundling's actual interests (associates owning part of two mines) and, therefore, that Tobias neither gained nor lost by his agreement with Gundling, as Gundling asserted when the agreement was made. The present owner of the stock is defending in this case and none of the origi-

nal incorporators have any right to complain, even had they not all parted with their stock. Neither can the company, or plaintiff in its behalf, complain of the transaction. [Old Dominion Copper Co. v. Lewishon, 210 U. S. 206; Milwaukee Cold Storage Co. v. Dexter, 99 Wis. 215.]

This is not a case in which promoters have deceived their fellow incorporators or subsequent subscribers by misrepresenting or concealing the price of property delivered to a corporation they were forming. There is no evidence Gundling would have accepted a dollar less than the $257,000 he contracted for or that he would have made the agreement he made with Tobias except upon the theory that Tobias's stock equaled the value of what he, Gundling, was receiving—a view the evidence tends strongly to support when the outstanding interests Gundling was obligated to acquire and Tobias's assumption of one-half of this burden are considered.

The $63,000 in bonds and the stock accompanying them properly went into the declaration of trust as the substitute for the $57,000 vendor's lien which was first included but had been used by Gundling to acquire them.

III. The trial court did not, apparently, give great weight to the document whereby Isaacs at plaintiff's instance agreed to extend Gundling's notes for · $68,000 in consideration that he recognize certain rights of plaintiff. When plaintiff amplified this, in writing, to provide that Gundling should turn over one-half of Tobias's stock and bonds in his hands, plaintiff promptly refused to agree. When the document mentioned was signed, plaintiff was and for months had been Gundling's attorney, employed to oppose claims Tobias was making in connection with the declaration of trust and which Gundling thought were inequitable and unjustifiable under that instrument. Plaintiff, sev-

eral months after being engaged by Gundling as his attorney in this matter, advised Gundling that Tobias could not recover anything but that he, plaintiff, could, as Tobias was his partner, and advised Gundling to turn over to him Tobias's stock and bonds. This Gundling and another of his lawyers testified he refused to agree to do. The trial court evidently believed then instead of believing plaintiff and Isaacs, and the record does not persuade us the trial court was wrong in this. The alleged "confession" of Gundling, in July, 1906, that Tobias had kept him informed of plaintiff's doings in connection with his transactions in the east, has little of substance in it, was explained by Gundling as relating to matters after September, 1905, and on plaintiff's construction of it is inconsistent with his denial of all knowledge of the declaration of trust until November, 1906. Further it is of little consequence unless plaintiff and Tobias were partners, a fact not made out on this record. The judgment is affirmed. *Brown, C.*, concurs.

PER CURIAM.—This case coming into Banc from Division on a dissent, on rehearing the opinion of BLAIR, C., is adopted as the opinion of the court. *Woodson, Graves, Brown, Walker,* and *Faris, JJ.*, concur; *Lamm, C. J.*, and *Bond, J.*, dissent.