WILLIAM M. HENDERSON, ALBERT R. BUDD, WALTER J. WILSON
and FLOYD B. LOCKHART, Complainants Below, and
WILLIAM F. McCULLOUGH and ROLLIN C. MONTELIUS,
Intervening Complainants Below, Appellants,

*vs.*

PLYMOUTH OIL COMPANY, a corporation organized and existing
under the laws of the State of Delaware, MICHAEL L. BENE-
DUM, SARAH N. BENEDUM, JOSEPH C. TREES, TREES DE-
VELOPMENT COMPANY, LIMITED, LEVI SMITH, JEROME G.
FARQUHAR, WILLIAM E. HUSTON, EDWARD C. STEARNS,
THOMAS R. COWELL, WALTER S. HALLANAN, FOSTER B.
PARRIOTT, ADDISON F. HOLLIDAY, J. CHARLES ADAMS,
HENRY R. DAVENPORT, JOHN LAING, JOHN M. HOLLIDAY,
RAY V. HENNEN, JOHN S. HANLON, ADDISON B. DALLY, JR.,
OVID D. ROBINSON, ELLSWORTH D. ROBINSON, JOHN J.
KIRKLAND, H. D. McCRACKEN, M. E. DAVIS, ARTHUR C.
FLORES, S. A. McCASKEY, C. H. HUSTON, ANNE A. ADAMS,
THOMAS R. COWELL, JR., ELIZA COWELL, BETTY COWELL,
MILES W. BOTTOMFIELD and SAMUEL M. DUNBAR,
Defendants Below, Appellees.

*Supreme Court, on Appeal, Jan. 17, 1928.*

352

358

PENNEWILL, C. J., HARRINGTON, RICHARDS, and RODNEY, JJ., sitting.

*Josiah Marvel* and *Caleb S. Layton*, of the firm of Marvel, Layton, Hughes & Morford, and *Owen J. Roberts*, of Philadelphia, Pa., for appellants.

*Robert H. Richards* and *Andrew C. Gray*, of the firm of Ward, Gray & Ward, and *John W. Davis*, of New York City, for appellees.

PENNEWILL, C. J., delivering the opinion of the majority of the court:

In the course of this opinion, we shall treat Stearns as the promoters, for he was merely their representative, and shall treat the conveyance of the promoters' property to the Big Lake Company as a conveyance to the Plymouth Company, which was at all times the real company in the minds of the promoters.

The case of the complainants is based very largely upon the following proposition of fact and law:

"The promoter defendants were acting as agents of the Plymouth Oil Company in the acquisition of their properties and are not entitled to secret profits."

It is claimed that at the time of the making of the Pickrell contract the defendants stood in the relation of agents for the corporation intended to be formed by them, and they could therefore take no secret profits in the transaction. This is a fundamental contention in their case, and its correctness is conceded if warranted by the facts.

In his opinion, the Chancellor says (136 *A.* 141):

"If the promoters were under fiduciary obligations to a proposed corporation at the moment they acquired properties, or rights to property which the corporation is to take over, and the cirumstances are such as to show that they were acting in the capacity, actual or *quasi*, of agents purchasing for and on behalf of the proposed corporation, then considerable and very respectable authorities hold that the rules obtain which are applicable to the dealings of an agent for his principal. The promoters in such case are bound to account according to the settled principles of law attaching to that relationship. Among these principles is the familiar one that any profit or personal advantage gained by the agent at the expense of the transaction which he puts through in behalf of his principal belongs to the principal, no matter how profitable for the principal the transaction, even after

subtracting from it the agent's gain, may in point of fact prove to be. This is the rule which the complainants contend for as governing this case."

This quotation from the opinion of the Chancellor states clearly and correctly a well-settled principle of law and we know of no authorities to the contrary. The defendants do not question the principle, but deny its application to the facts of the case.

The Chancellor decided that there was nothing in the facts warranting the view that the Stearns transaction with Pickrell was on behalf of the future corporation, "Stearns was a purchaser in his own right and under personal obligation to carry out his contract. The fact that he, when he became purchaser on October 5, 1923, intended to form a corporation to purchase these rights cannot alone serve to convert his purchase into one made on behalf of the future corporation. * * * Stearns was bound to eventually 'close' the contract as agreed, regardless of whether a corporation was ever formed. * * * The important thing in this connection is that Stearns when he made his agreement with Pickrell was irrevocably committed to the cash obligations. He was personally bound and continued so to be to the end. Pickrell had Stearns' notes endorsed by certain of his associates * * *.When many of these endorsements were made, not much risk of loss to the endorsers was incurred. But there is the fact of their existence which cannot be overlooked." Stearns might have changed his mind and concluded not to sell the property to the company. He and his associates were at liberty to do as they pleased with the property; "they could have held it as individuals, or sold it to a corporation either of their own creation or already existing."

We have taken only a few extracts from the Chancellor's opinion, but they are sufficient to show his conclusions on the question of agency, and the reasons therefor.

After all, the important consideration in this connection is, not so much what Stearns and his associates did, or the legal effect of the contract, but what was their real intent when they bought the Pickrell rights.

Many authorities were cited on this question, but they are not very helpful because whether promoters buy property for the company must be ascertained from the evidence in each case. Therefore, the question whether the promoters in this case were

agents of the company when they bought the property subsequently transferred to the company must depend on the facts and circumstances of this particular case.

Having found that the promoters bought the Pickrell property for themselves and not for the company, and having also found that the property transferred to the company was fairly worth the stock issued therefor, the Chancellor treated such finding as decisive of the case, and deemed it ·unnecessary in his final opinion to express an opinion on certain other questions argued at length.

But the complainants insist that even if the promoters were not agents of the company when they secured the Pickrell property, a fiduciary relation nevertheless existed between them and the company they organized, and to which they sold their property. It would have been different, they say, if the property had been transferred to a company, not controlled by the promoters but independent, and dealing at arm's length with the promoters. But it is otherwise if the promoters are on both sides of the transaction.

The complainants base their contention on certain American and English cases, and particularly the reasoning in the case of *Old Dominion Copper Mining & Smelting Co. v. Bigelow*, 203 *Mass.* 159, 89 *N. E.* 193, 40 *L. R. A.* (*N. S.*) 314, in which the court said:

"It is now established without exception that a promoter stands in a fiduciary relation to the corporation in which he is interested, and that he is charged with all the duties of good faith which attach to other trusts. In this respect he is held to the high standards which bind directors and other persons occupying fiduciary relations. That the promoter stands in the relation of a fiduciary to the corporation which he organizes seems to be conceded in *Old Dominion Copper Mining & Smelting Co. v. Lewisohn*, 210 *U. S.* 206 [28 *S. Ct.* 634, 52 *L. Ed.* 1025]. The questions to be answered are, whether this rule is applicable, and if it is, whether the plaintiff is in a position to assert its claim."

In the *Bigelow* and *Lewisohn Cases* the facts were the same.

The promoters were not acting for the company when they bought their properties. Nevertheless, it was held in the *Bigelow Case*, as it had been in other cases in this country and England, that promoters sustain a fiduciary relation to the company they

organize and control when they sell their property to such company.

The defendants insist that promoters do not owe a fiduciary duty to a company composed entirely of themselves, and that when a corporation is legally organized by promoters to take over their property at a fair valuation, its corporate acts are binding, including the purchase of the property; and that no one, especially one who is not a stockholder at the time, has a right to complain.

But the theory of the cases referred to seems to be, that if, at the time the property is bought by the promoters, or when the company is organized and the property taken over, it was the intention of the promoters to issue stock and sell a part of it to the public, there was a fiduciary relation on the part of the promoters which made it their duty to fully inform future purchasers of stock of the profits made by the promoters in the sale of their property to the company. And not only so, but that such uninformed stockholders may at any time maintain an action, in the name and behalf of the company, against the promoters, either for the rescission of their contract, recovery of damages measured by the profits received, or the cancellation of the promoters' stock. The position of the complainants seems to be, that the drastic relief prayed for in this case may be granted even though the company, as such, has not been deceived, has sustained no injury, and has purchased the property of the promoters with full knowledge of all the facts, and there was no profit secret from the company.

It would seem more logical and reasonable to hold, that if the company, composed of promoters, bought the promoters' property with full knowledge of all the facts, no outside stockholder being then interested, and if one or more of the promoters concealed from, or misrepresented to, some future stockholders the profits the promoters received, the remedy of such stockholders, if any they have, would be individual and not in the name of the company that has sustained no injury from overvaluation or misrepresentation.

But, we are not required, in the present case, to approve or disapprove the doctrine of the *Bigelow Case*, and others to the same effect.

The one basic fact that distinguishes the instant case from others in which the fiduciary rule was held to apply is this:

The property sold by the promoters to the company was fairly worth the par value of all the stock that was given for it. It was not so in the *Bigelow Case* and in most of the others relied on by the complainants. There was in them overvaluation, and that was the fraudulent act charged against the promoters. According to such cases the breach of trust is committed when the promoters sell to the company their property at an excessive price.

Another distinguishing fact is that in the case before the court all the capital stock was given to the promoters for their property, and there was no intention on the part of the promoters, or the company, to issue other stock, as in the *Bigelow Case*.

In that case recission was refused, and we are convinced that under the facts of the present case the Massachusetts court would have denied the complainant any relief. And even as the facts were, that court was not unanimous in its decision. Chief Justice Knowlton, and two other judges, three out of seven, dissented from the opinion of the majority, and approved the law as laid down in the *Lewisohn Case*, which is not in accord with the principal holding in the *Bigelow Case*.

In speaking of the *Lewisohn Case*, Justice Rugg, in deciding the *Bigelow Case*, said:

"With great respect to the decision, * * * we are constrained to adhere to the law as laid down in the earlier cases in this Commonwealth,"

—thereby showing that the court was influenced to some extent by the rule of *stare decisis*.

But even that case cannot be regarded as authority against the defendants here because the material facts are so different.

We quote from Justice Rugg's opinion:

"That the promoter stands in the relation of a fiduciary to the corporation which he organizes seems to be conceded in *Old Dominion Copper Mining & Smelting Co. v. Lewisohn*, 210 *U. S.* 206, 28 *S. Ct.* 634, 52 *L. Ed.* 1026; *Id.* (*C. C. A.*), 148 *F.* 1020. The questions to be answered are, whether this rule is applicable, and if it is, whether the plaintiff [the company] is in a position to assert its claim. Notwithstanding this fiduciary relation the

promoter may sell property to the company which he is promoting. But in order that the contract may be absolutely binding he must pursue one of four courses: [Courses A and B the defendant admitted were not followed.] (C) He may procure a ratification of the contract after disclosing its circumstances by vote of the stockholders of the completely established corporation; (D) He may be himself the real subscriber of all the shares of the capital stock contemplated as a part of the promotion scheme."

The court held that course D had not been followed, because—

"the defendant and his associate were subscribers for only one hundred and thirty thousand shares out of a total of one hundred and fifty thousand, and in the light most favorable to them they held all the shares which had been issued at the time of the ratification. * * *

"A review of the authorities seems to demonstrate that there is a liability of the promoter to the corporation when further original subscribers to capital stock contemplated as an essential part of the scheme of promoters came in after the transaction complained of, even though that transaction is known to all the then stockholders, that is to say, to the promoters and their representatives. * * *

"It has been decided that where persons own the entire authorized capital stock of the company and take it in payment for the conveyance of their property at a grossly exaggerated price, nobody can be heard to complain."

But the court said:

"The distinction is clear between cases of that class and those like the present, where the promoters took for themselves a large number of shares of stock without adequate consideration and without disclosure to the detriment of the corporation and all its future shareholders, at the same time planning that there should be immediate public subscriptions. It is one thing to take all the shares of a corporation in payment for physical property conveyed. * * * But it is a very different thing to take 130000/150000 of capital stock of a corporation whose assets consist of the same physical property, and in addition $500,000 in money subscribed by others. * * *

"The wrong is not done when the innocent public subscribes, but when the sale was made to the corporation at a grossly exaggerated price with secret profit. The occasion for complaining of this wrong comes when the promoters issue to the public the balance of the stock in order to provide the money necessary to set the corporation on its feet and to give thereby the contemplated value to the stock taken by themselves in payment for their mines. The exemption of the promoter from liability to the corporation for a sale without disclosure when he takes the entire issue of capital stock is an exemption to the general rule imposing upon him the liabilities of a trustee."

We have quoted enough to show how greatly the *Bigelow Case* differs from the present one, and that it is not an authority against the defendants.

In the *Lewisohn Case*, which involved the same facts as the *Bigelow Case*, the court reached a different conclusion, holding that the plaintiff could not recover at all. The court said:

"The ground of the petitioner's case is that Lewisohn, the deceased, and one Bigelow, as promoters, informed the petitioner that they might sell certain properties to it at a profit; that they made their sale while they owned all the stock issued, but in contemplation of a large further issue to the public without disclosure of their profit."

After the sales were consummated, "to raise working capital, it was voted to offer the remaining 20,000 shares to the public at par, and they were taken by subscribers who did not know of the profit made by Bigelow and Lewisohn and the Syndicate."

The suit was brought to rescind the sale, or recover damages. The court continued:

"The difficulty that meets the petitioner at the outset is that it has assented to the transaction with the full knowledge of the facts;" and the court held that it was not "competent * * * for judges * * * to establish that a corporation shall not be bound by its assent in a transaction of this kind, when the parties contemplate an invitation to the public to come in and join as original subscribers for any portion of the shares. * * *

"It is difficult, without inventing new and qualifying established doctrines, to go behind the fact that the corporation remains one and the same after once it really exists. When, as here, after it really exists, it consents, we at least shall require stronger equities than are shown by this bill to allow it to renew its claim at a later date because its internal constitution has changed."

The Federal Court distinguished the leading English case, *Erlanger v. New Sombrero Phosphate Co.*, 3 *App. Cas.* 1218, relied on in the *Bigelow Case*, by saying:

"There never was a moment when the company had assented with knowledge of the facts."

And it may be said, that in most of the cases cited by the complainants the stock offered to the public was clearly stock of original issue, the promoters' property was turned over to the company at an excessive valuation, or the company assented in ignorance of the facts.

According to the *Lewisohn Case*, and others, it makes no difference that all the stock has not been issued if the corporation is legally organized and consents to the transaction with full knowledge of the facts. We are not required, in the present case to go so far, because all the stock was taken by the promoters in exchange for their property, and there was no intention of issuing any more original stock.

But the complainants say the reasoning referred to in the *Bigelow* and *Lewisohn Cases*, and others like them, should not control the instant case because in those there was no question of agency involved, the promoters did not buy the property for the company they organized. That is true, but we can see no difference in principle, in respect to the fiduciary relation, between those cases and the case at bar where the company had knowledge of the profits the promoters received, and with full knowledge of the entire transaction consented thereto. True, the company was organized entirely by the promoters. They were the only persons interested at the time, except possibly two others who had been solicited to buy stock but who are not complaining. The entire board of directors, who were promoters, were fully advised of the purchase of the property turned over to the company, the profit that was made and how it would be paid. The company, being legally organized, approved all the promoters had done and carried out the contract made with Pickrell. Under the *Lewisohn Case* clearly the corporate action was legal and binding. There is no fact in the case more fully shown than this: The company, when it took over the promoters' property, and agreed to pay for it, had received no injury at the hands of the promoters, either from overvaluation of the property transferred, or because of any misrepresentation or concealment respecting it. Another fact, tending at least to rebut intentional concealment or misrepresentation by the promoters, is that the minutes of the company showed the Stearns-Pickrell contract, the profits made by the promoters, the total amount of stock issued to the promoters for their property, and other material facts.

While admitting that such facts are shown by the evidence, the complainants insist that the promoters were not absolved

from their fiduciary obligation to the company because in dealing with the company they were dealing with themselves, and were on both sides of the transaction; it would be otherwise if the transaction had been between the promoters and an independent company, not controlled by them. But the court is of the opinion, and the authorities sustain it, that the promoters had a right to organize the company and to make a profit in the sale to the company of the property they had bought, even though they had secured it for the company, provided it was worth the stock given for it, and provided also they disclosed the profit they would make, and the company, with full knowledge of all the facts, consented before the rights of the complainants intervened. In such case there was no secret or undisclosed profit.

We are not dealing with the right that a future stockholder might have, to maintain an action against a promoter for misrepresentation made for the purpose of securing a stock subscription, but are dealing with the question whether a stockholder who bought his stock after the transaction between the company and promoters was fully completed can maintain a suit in the name and behalf of the company for the cancellation of the promoters' stock. Under the facts of this case we are of the opinion that such an action cannot be maintained.

The Chancellor, in his final opinion, said (15 *Del. Ch.* 231, 234):

"As I view the case, it is not necessary for me to discuss the question of the right of future stockholders contemplated by promoters of the corporation to be brought into its membership to call the promoters to an account for so-called profits made by the promoters in connection with a sale by them to it at a time when the corporation was composed entirely of themselves and was in their complete control. I say this because I shall assume for the purpose of this case that the point of view of the complainants on this point is sound, viz., that the complainants and interveners, though they came into the corporation after the Stearns-Plymouth contract was entered into, have such standing in equity as entitles them to maintain their bill in behalf of the corporation if on the facts a good cause of action is otherwise shown."

The Chancellor did not decide that the complainants had a right to maintain an action in behalf of the company. In his view of the case it was unnecessary to express an opinion on that point.

He did, however, in an opinion given at an earlier stage of

the case when refusing the issuance of a preliminary injunction say (15 *Del. Ch.* 40, 61):

"For the reasons above given it therefore appears that the complainants and all interveners with them as holders of preferred stock are in the situation of those who hold stock which was lawfully issued to the promoters and are as effectively precluded from any complaint, if there be a ground for any, as the promoters would be from whom they derive their title. This in itself constitutes a sufficient ground for a discharge of the present rule. The feature of the promotion stock as issued for lawful value which strips it of all semblance of being in reality stock of original issue, while serving thus to foreclose the complainants from complaining, at the same time serves also in another aspect of the case in a yet more emphatic way to render it highly inequitable to grant the relief of cancellation which the bill seeks. This aspect of the matter will, however, be reserved for final discussion."

The Chancellor, in this opinion, reviewed and analyzed so thoroughly the authorities relied on by the plaintiffs, and showed so clearly their inapplicability to the facts of the case before him, that we deem it unnecessary to repeat the labor.

The authorities that are supposed to have some application to the present case have been reviewed, not only by the Chancellor in one or the other of his two opinions, but have also been reviewed in the *Bigelow Case* at great length, and to some extent in the *Lewisohn Case*. Perhaps every reason that has been given, every argument that has been made for the adoption of the one doctrine or the other has been presented in these cases, and when carefully considered we have all that can be said on either side of the main proposition involved therein. Some state courts have chosen to follow the *Bigelow Case*, but we think many more courts, and authoritative law writers, have adopted the rule of the *Lewisohn Case*. In this connection may be mentioned the thought expressed by Chief Justice Knowlton in his dissenting opinion in the *Bigelow Case*:

"In addition to the deference that a unanimous opinion of the Justices of the Supreme Court of the United States should receive in any other court, it is for me a very important consideration that, upon questions which will often be litigated in the Federal tribunals by reason of the diverse citizenship of the parties, the law ought to be the same in the state courts as in the Federal courts. It would be unfortunate if, in this large class of cases, the rights of a suitor should depend upon whether he is finally held subject to the jurisdiction of a Federal court or to that of a state court."

In refusing to grant the relief asked for this court is not required to disapprove the law laid down in many of the cases upon which the plaintiffs rely because the facts are essentially different. We have seen no case possessing all the elements of this one where a court has granted such relief.

In this case no outside or uninformed person was solicited by any promoter to buy stock other than that which had been given to the promoters in part payment for their property; if any complaining stockholder sustained an injury in the purchase of his stock it was on account of misrepresentation or intentional concealment of promoters' profits by some promoter after the transaction between the promoters and company was completed. In such circumstances it is impossible to see how the company was injured, and it is hardly conceivable that the present action in the name and behalf of the company could be sustained, or that a court of equity would grant the drastic relief prayed for— the cancellation of the promoters' stock—when the property they gave for their stock cannot be restored to them, and they can receive no compensation for their services which made the stock of the company of great value.

The case of the complainants is based largely, and necessarily, upon the alleged fact that it was contemplated by the promoters that subsequent purchasers of stock should be solicited for the purpose of securing the money needed for working capital, and that there is no authority that forbids these subsequent stockholders to complain in the name of the company of the taking of a secret profit by the promoters. We think that such a complaint is forbidden by the *Lewisohn Case* and many others that follow it. But while the promoters did contemplate the sale of preferred stock to outsiders for the purpose of raising working capital, they contemplated at the same time, and all the time, the issuance to themselves of the entire capital stock, including the preferred, in payment for their property. And in pursuance of such purpose the entire capital was given to them by the company after it was formed. The stock contemplated to be sold to outsiders was not, therefore, stock of original issue, but stock that the promoters would take in part payment for their property. It was such stock that was sold by the promoters to outsiders.

The defendants claim that the English cases upon which the complainants so much rely are inapplicable to the present case because of the English Company's Act. The distinction may be sound, but we prefer to base the inapplicability of such cases, and all others cited by the complainants, on this ground, viz.:

That the essential facts are different from those of the instant case.

In all of the cases referred to there was either overvaluation of the property turned over to the company, the entire capital stock was not given to the promoters for their property, there was a future issue of stock contemplated, or stock of original issue was sold to the public at an unfair price or without disclosure of promoters' profits.

In other words, there was some fraudulent act on the part of the promoters either of misrepresentation or intentional concealment that tainted their transaction with the company and made them liable in some way to the company.

In this case there was no fraud perpetrated on the company as such, and it is not claimed there was.

We have seen no authority which holds, that the company is injured, and that there can be, on its application, a cancellation of the stock of promoters who have organized a company composed entirely of themselves, and transferred to it their property at a fair valuation for the company's entire capital stock, the company having complete knowledge of all the facts, and no complaining or innocent stockholder being interested at the time. Davenport and Laing were not such stockholders and it is not claimed there were any others.

We think the only debatable point in the case is, whether the preferred stock that was sold to the outsiders was stock of original issue within the meaning of the law. The mere fact that the preferred stock was given to the promoters in part payment for their property, and immediately transferred back to the company, did not necessarily divest the stock of the character of original issue when sold to outsiders if the transaction was a mere trick or species of jugglery to relieve the promoters from any liability.

If the stock given to the promoters for a lawful consideration, had been sold by them to outside persons, certainly the corporation could not complain, and the purchasers would be in no· better position than the ones from whom they bought. There is practically no dissent even in the *Bigelow Case* from the principle stated by *Ehrich* in his work on the *Law of Promoters*, at paragraph 120:

> "It is now established by an almost unbroken line of decisions, that if the promoters themselves take the entire share capital of the corporation and then sell the shares to outside parties, there is no fraud upon the corporation, and no basis of complaint by it, no matter what profits the promoters may derive from the transaction. * * *
>
> "If. there is any fraud in subsequent sale of shares the cause of action arising therefrom is personal to the purchasers. The matter is between these purchasers and their vendor, and no cause of action results to the corporation therefrom."

The only question is the application of this principle to the facts of the present case.

There can be no doubt that the corporation had the right to issue all its capital stock to the promoters for their property, which was worth the par value of all the stock. The company did by formal resolution accept the property and direct the issuance of the entire capital therefor. The promoters were, therefore, the owners of the stock and the company the owner of the property. The promoters could have sold the preferred stock which they owned to outside parties had they chosen to do so and donated the proceeds, instead of the stock, to the company. There can be no doubt of this, and we do not understand it is denied. The promoters knew perfectly well that working capital would have to be provided in some way; it was of vital importance to them that it should be provided, and there did not seem to be any way available except the sale of some of their stock, and preferably preferred stock. Instead of selling it themselves they concluded to have the company sell it, and so provided by the medium of a trustee. It seems to have been a very reasonable method because, presumably, it could be sold better by the company than by individual owners. Of course, we do not know what was the promoters' real thought and un-

disclosed intent, but what evidence is there that shows they intended to make it appear that the stock was their stock when it was in fact original stock? There may be a suspicion, but there is nothing in the record which shows, or tends to show, that such was the real intent. The one thing, more than any other, that has caused some courts to believe that promoters had such purpose was the fact that there was an unfair valuation placed on the property given for the stock. That fraudulent act so tainted the entire transaction that the court was perhaps warranted in concluding that the turning back of the stock for the company to sell was a mere pretense or subterfuge. There is nothing to warrant such a conclusion in the present case. A fact which strongly tends to show that the preferred stock sold to outsiders was not stock of original issue is this: It was sold for $3 per share when its par value was $5 per share. The former value was placed upon it after it had been given to the promoters and turned back to the company for sale.

It is unnecessary to further elaborate the point. The Chancellor, in his first opinion, discussed it at considerable length and showed the inapplicability of the few cases cited by the complainants. There is no evidence that shows, or tends to. show, that the principle stated by Ehrich in the text above quoted is not applicable to the facts of this case. The promoters owned the stock, its sale by the company was the same in effect as if sold by the promoters themselves, and the company has no right to complain.

It may be helpful to restate briefly, although at the risk of slight repetition, the facts upon which the complainants mainly rely:

The promoters, before they bought the Pickrell property, contemplated the organization of a company and the sale of stock therein to outsiders to raise working capital. Farquhar, one of the promoters, sold preferred stock to outsiders, representing to them that the entire issue of common stock was only 200,000 shares, when it was in fact 900,000 shares. Farquhar, Hallanan and Hennen, all promoters, solicited outsiders to subscribe to preferred stock prior to October 23, 1923, when the sale by the promoters to the company was made.

The offer of the promoters, through Stearns, to sell their property to the Plymouth Company (quoting from complainants' original brief)—

"was accepted by Plymouth October 23, 1923, the minutes of that date showing a resolution by the directors adjudging the properties and rights offered by Stearns to be of the value of $5,250,000 and authorizing the issuance to Stearns or his nominees of 150,000 shares of preferred stock and 900,000 shares of common stock of a par value of $5,250,000 therefor. Stearns agreed to turn back for the use of the company to provide working capital, the 150,000 shares of preferred stock to be received by him, and executed an agreement October 25, 1923, with Farquhar, one of the promoters, and Plymouth, whereby that stock was to be turned over to Farquhar as trustee and sold by Plymouth at such price as its directors should fix. The directors did in fact fix $3 per share."

Such are the facts upon which the plaintiffs must rely.

But there were no subscriptions by outsiders for Plymouth stock until October 20, 1923, when Davenport and Laing subscribed for 16,667 shares and paid $50,000 for them October 23, 1923. They are not complainants, but defendants. None of the complainants subscribed until November 2, 1923, when Lockhart subscribed and paid $3,000 for 1,000 shares of preferred stock. Before that time, the stock that the promoters received had been issued to them. After November 2, others subscribed who are complainants. So that on October 23, 1923, there were no stockholders other than the promoters, with the possible exception of Davenport and Laing. They bought their stock on October 23, 1923, the day the contract was made between Stearns, representing the promoters, and the Plymouth Oil Company, but it does not appear whether before or after the making of the contract. It does not then affirmatively appear that there were any stockholders, other than the promoters, when said contract was made.

In this connection we may mention these significant facts: Davenport, while not one of the promotors, was very closely connected with them before the organization of the company. He lived in Charleston, West Virginia, where his friend Laing also lived. After being solicited by Hallanan, one of the promoters, to become interested in the Plymouth Oil Company as a stockholder, he went to Pittsburgh on October 16, 1923, to look the situation over, and became convinced that the proposi-

tion was a good one, mainly because of his confidence in the judgment of Hennen, geologist, whom he knew, the reports of Hagan, another geologist, and the known production of a well that had been brought in, and had held up in production for several months, and this indicated that it was drawing from a large pool of oil, and he thought one of the major pools of the continent had been discovered. In Pittsburgh, he met and conferred with a number of the promoters, and concluded to invest $25,000 in the preferred stock of the company if his friend Laing would do the same. Each of them did invest that amount, and each was to receive, and did receive, as a bonus, common shares in equal number with the preferred.

Davenport consented to become a director of the Plymouth Company and was elected at the organization meeting in October, but did not attend any meeting prior to August of 1924. Subsequently, Laing was made a director. Presumably, Davenport was cognizant of all the promoters did leading up to the company's organization, and that Laing was also, through his friend; but Davenport testified he did not know how much common stock was outstanding until July, 1924, and then wrote to Farquhar that he never heard of promoters taking such a large profit, but had heard of their taking fifty per cent., or something to that effect.

Davenport also testified that:

"Mr. Farquhar came down to Charleston. The disturbance down there did not grow out of the amount of common stock that had been issued, it grew out of the fact that in selling the stock some men bought preferred but got no common stock, and some men bought preferred and got common stock, and some got more than others."

According to Davenport's testimony, Farquhar came down and made up a list of men who had not received common stock, and gave them so much common stock each.

And so it appears that Davenport and Laing, who are the only outside persons who are claimed to have become stockholders before the transaction between the promoters and the company was completed, were very close to the promoters and had knowledge apparently of everything except the profit they made. They knew they made some profit and objected only to

the amount. And the trouble with the Charleston subscribers, according to Davenport's testimony, was caused mainly by their failure to receive the common stock bonus, or as much as others received.

If the material facts in the case are interpreted as favorably to the complainants as possible, we are unable to see how their suit can be maintained even under the authorities cited.

We have said that the property taken over by the company was worth the stock issued for it, and cannot believe this fact is seriously controverted by the complainants. But they have argued the contrary at considerable length. It would unduly and unnecessarily prolong this opinion to analyze the testimony of the many witnesses on this point. It is for the most part opinion evidence and conflicting, but preponderates in favor of the defendants. There are, however, two facts bearing on the question of value that are undisputed:

(1) The property was, at the time of the trial before the Chancellor, immensely valuable. It was worth probably as much as $40,000,000. This was only two or three years after the purchase, and all that had been done to add to its value was drilling of wells and development. All the materials that made the property of known value later were present in the ground when purchased by the company. Inherently it was as valuable then as later.

(2) The value of the property when turned over to the company was a question of fact.

The Chancellor saw and heard the witnesses, who were examined orally before him, and had better opportunity than this court has of determining the credit and weight that should be given their testimony. Under the circumstances, we are of the opinion that the finding of this fact by the Chancellor should have much weight with the court.

But this action being on appeal, which brings up the entire record, including the testimony, the finding will not be regarded as conclusive unless there was evidence that supported the finding. We are of the opinion, not only that there was such evidence, but that it preponderated in favor of the defendants, and clearly warranted the Chancellor's finding. The directors valued the

property at $5,250,000, and the resolution of valuation was adopted after a careful investigation by skilled and competent men extending over a period of several weeks. There was testimony that it was then worth $12,000,000. Based on the reports of very capable geologists and the production of the first well brought in, Davenport thought one of the major pools of the continent had been discovered.

We have not before adverted to the equities of the case because the law, if applicable, must control. But the decision of a court of equity is to be based, so far as may be, on the equities, and for that reason it may not be amiss to say they are in the favor of the defendants.

By reason of the good judgment, foresight, initiative and efforts of the promoters the Plymouth Oil Company became the owner of properties that are admittedly of immense value to its stockholders. The promoters have made the stock of the complainants exceedingly desirable, and without any effort or risk on their part. The complainants say it was their money that furnished the working capital and caused the success of the company. They did not furnish all the working capital or even the half of it, and besides they bought their stock at a time when the success of the company was assured and their investments safe.

In addition to the questions already considered there were others raised and argued which should be noticed, although they do not seem to be material to the real issues in the case.

They tend to confuse if not obscure the real issues. They have no perceptible bearing on the alleged fiduciary relation, and we do not understand it is claimed they have.

They are, as the Chancellor observed, as to some of them, but incidents to the main transaction. For instance, the circumstances that the promoters did not receive their stock until November 16th, by which time so-called innocent stockholders had come into the corporation. This fact can have no significance because it is well known that stock is usually received some time after the purchase. While the delivery of the stock was delayed, the company had, by formal resolution, adopted October 23rd, directed its issuance and delivery in payment for the promoters'

property. The stock was then owned by the promoters and their property by the company.

Equally immaterial to any issue in the case is the alleged fact that the contract the promoters made with Pickrell was in violation of the Texas law. The important thing is, that notwithstanding the Texas law, the contract was made, its validity was never questioned until the trial of this case and in pursuance of its obligation Pickrell delivered to the promoters at a later date possession of all the property he purported to sell and was legally bound to deliver. We do not think the complainants place any insistence on this point.

Another circumstance the complainants advert to as material is that the time for "closing" the contract was at some date in November subsequent to the formation of the Plymouth Oil Company and the purchase of preferred stock by some of the complainants. As the Chancellor said (15 *Del. Ch.* 240):

"By this term 'closing' is meant the actual physical deliveries provided for by the Stearns-Pickrell contract. * * * The postponement [of deliveries] was made necessary simply because of certain necessities connected with the clearance of titles. The deferring of the so-called 'closing' date was a mere incident to the transaction between Stearns and Pickrell."

Stearns, who represented the promoters, was legally bound to close the contract and did so.

It is further contended by the complainants that Stearns had, under his contract with Pickrell, no property rights, but only an option to purchase, which he induced the corporation to exercise. But the contract that Stearns had with Pickrell was legal and binding. It conferred certain definite rights and imposed certain definite obligations; it bound Pickrell to convey the property and he carried out his agreement.

Pickrell owned some interest in the property he purported to convey, and controlled the whole with the consent of the other owners. Even if his title was not complete, he eventually delivered the property with good title thereto. The Plymouth Company, to which the Pickrell property was transferred, obtained actual possession, and its right of possession has never been questioned so far as we know.

While the complainants may not have much confidence in

the points we have just considered they do not seem to lay much stress on the fact that the Pecos and Upton County properties, the purported sale of which constituted a part of the consideration for the stock the promoters received, were not owned by Stearns at the time he undertook to convey them to the Plymouth Company. As to them, he had no title whatever, and the company received none until November 29, 1923, by which time some of the complainants had become stockholders of the company. Because of this it is contended that the promoters were not permitted to make a profit in the sale of such properties. The Chancellor disposes of this contention by saying that Stearns undertook to convey said properties, and whether he had any title or not; he was firmly bound by this contract to deliver title and did so about a month afterwards. But there is another ground upon which the contention may be disposed of, viz.: It is not shown that the promoters made any profit out of this transaction. It does not appear what part of the stock they received for all the properties was paid for the Pecos and Upton County properties, and it would be impossible for the court to separate them. If it be necessary, in order to charge the promoters with the unlawful retention of profits in the sale of the Pecos and Upton County properties, to show what those profits were, clearly the burden is on the complainants who make the charge. The one important fact that does appear from the record is that the Pickrell properties, represented by the Big Lake stock, were worth more than all the stock issued for the whole.

It being impossible to tell from anything in the record what profits, if any, the promoters made in the sale of the Pecos and Upton County properties, it would be impossible for the court to say what proportion of their stock should be cancelled if, under the law, there should be cancellation in case the profits were known.

There is testimony by one witness, Hennen, that, in his opinion, these properties were worth $25 per acre, making for the whole $300,000, but this does not prove what profit was made by the promoters at the expense of the company, or what part of the stock consideration given for all the properties was given for those particular properties.

For the reasons stated, the decree of the Chancellor will be· affirmed.

HARRINGTON, J. (dissenting). While I am unable to agree with the final conclusion reached by the majority of the court, I do, however, agree with their conclusion that the actual conveyance of the Pickrell property to the Big Lake Oil Company, rather than to the Plymouth Oil Company, does not materially affect the merits of this case, with respect to that property.

The Big Lake Company was merely organized for the purpose of protecting the interest of Pickrell and his associates, and as the majority opinion aptly says:

"The Plymouth Oil Company was at all times the real company in the minds of the parties."

For most purposes, we may, therefore, consider this case from the same standpoint as though the conveyance of that property had been made directly to the Plymouth Oil Company.

The main facts have already been stated and I will neither repeat nor add to them, except where it may be necessary to justify certain conclusions reached by me.

It is, however, material to state that it is admitted that Stearns was one of the Pittsburgh group, who organized the Plymouth Oil Company, and, in all acts performed by him, was acting for that group.

It is, also, material to state that as a part of the consideration for the issuance of the Plymouth Oil Company stock to him, Stearns, on October 23, 1923, offered to assign to that company certain rights which he claimed to hold in the Pecos and Upton County properties. This offer was accepted on the same date by the corporation, but, as a matter of fact, it is admitted by the respondents that he had no rights whatever in those properties at that time, and acquired no rights in the Pecos County property until November 29, 1923, and in the Upton County property until October 29, 1923.

The record also shows that Lockhart became the owner of stock in the Plymouth Oil Company on November 2, 1923, Montelius on November 7, 1923, and McCullough on November 12, 1923.

Various other persons among the appellants also purchased considerable blocks of the preferred stock from the corporation in January, February, March and May of 1924, while the success of the company was not assured, and it had not gotten beyond what was termed the "wildcat" stage until the early summer of 1924; as a matter of fact, well No. 9 though a large producer, was not completed until June 20, 1924.

Henderson then purchased the last of the preferred stock issued after that date, though he then owned more than 13,000 shares, the most of which had been purchased from the corporation in January and February, 1924.

The production, if any, of any of the other wells, drilled either under the Pickrell contract, or otherwise, does not appear. Fifty thousand shares of the preferred stock remained unsold in February of 1924. So a letter soliciting further subscriptions was sent to each stockholder of the Plymouth Oil Company. This letter was signed by Hallanan and Farquhar, as president and treasurer of the corporation, though they were also, members of the promotion group. It, also, stated that the corporation had been formed to take over the oil rights forming the basis of this action.

It appears that the purchase price of the Upton County property was $1,920 and that this amount was paid out of the funds of the Plymouth Oil Company about October 29, 1923, but in November, 1924, was charged in the books of the corporation to Stearns, and subsequently paid by him and his associates. The purchase price of the Pecos County property does not appear.

While the appellants admit that, at least, some of them knew that the Stearns group had retained 200,000 shares of the common stock of the Plymouth Oil Company, representing a par value of $1,000,000, as a profit on their transaction with that company, it is not contended that it clearly appears that they knew of the retention of the remaining 700,000 shares, representing a par value of $3,500,000, in addition thereto, or a total profit of $4,500,000.

The Pickrell contract, as well as the stock retained, was, however, set out in the minutes of the Plymouth Oil Company

as of October 23, 1923, and it is, therefore, contended that there was no concealment from that corporation.

The details with respect to the Upton and Pecos County properties also appeared therein, but it was admitted that they had been inserted after October 23d.

Whether the persons above named indirectly acquired their stock from the promotion group, or as original subscribers from the corporation, and the facts with respect thereto, will be considered hereafter.

The appellants base their contention on the claim that 700,000 shares of the common stock of the Plymouth Oil Company were improperly, and contrary to the rules of equity, issued to the Stearns group, who promoted the organization of that company, and in so far as such shares are not now held by bona fide purchasers should, therefore, be cancelled.

Their right to cancellation is based on the contention that a fiduciary relation then existed between the promotion group and the Plymouth Oil Company.

So far as the Pickrell property is concerned, this contention is based on two separate and distinct grounds:

1. That when the Stearns group contracted to buy the oil rights in that property, they occupied the relation of promoters toward the Plymouth Oil Company, and were acting for it, though that company had not then been organized and, therefore, had no right to retain any secret profits on the transaction. When they subsequently conveyed the oil rights in the lands in question to that company, they nevertheless retained a secret profit of 700,000 shares of the common stock of the Plymouth Oil Company, which had a par value of $3,500,000.

2. But even if it be conceded, for the sake of argument, that the Stearns group did not occupy the relation of promoters toward the Plymouth Oil Company, when they executed that contract, and were not then acting for that corporation, but for themselves individually, they subsequently sold the oil rights in the lands in question to the Plymouth Oil Company, and at the time of such sale the same group composed the board of directors of that corporation, and, therefore, controlled its actions.

That, while by reason of controlling the corporation, they

had no right to sell the oil rights in question to it at a price in excess of their fair and reasonable value at the time, they, nevertheless, sold them to the Plymouth Oil Company for $5,250,000; and that such price was far beyond the fair market value of the property at the time.

If the Plymouth Oil Company had a right of action in this case, the right of the complainants to file their bill in order to litigate such corporate rights is conceded. *Sohland, et al., v. Baker, et al.,* 15 *Del. Ch.* 431, 141 *A.* 277. Whether, however, the corporation had any such right is the question at issue.

The contention of the appellants that the Stearns group were acting for the Plymouth Oil Company, when they agreed to purchase the Pickrell property, is a fundamental question in this case, and I will, therefore, consider that contention first.

The Pickrell contract was executed October 8, 1923, and the Plymouth Oil Company was not organized until October 23d of that year.

The appellants, however, claim that the record shows that prior to October 8, 1923, the Stearns group had not only decided to organize the Plymouth Oil Company, and, in effect, to convey the Pickrell property to it, but had, also, taken definite steps to promote the organization of that corporation with the intent that the whole purchase price of the Pickrell property, and all obligations under the Stearns' contract, should be assumed by it when it should be finally organized.

With respect to this contention, *Ehrich on Promoters*, at *Section* 5, aptly says:

"One method of obtaining secret profits, frequently resorted to by the promoters, is the purchase for their individual account of property which the corporation is organized to acquire, and the subsequent resale thereof to the corporation at an advance. Sometimes title to the property is actually taken by the promoters and by them conveyed to the corporation. Sometimes the promoters merely contract for the purchase of the property, or take an option thereon, and after arranging a resale to the corporation at an increased price cause the title to pass from the original vendors directly to the corporation. The substance of the transaction is in either case the same, and the profit unlawful. If the purchase is made by the promoter at a time when they have entered upon their fiduciary relation to the corporation, it is their duty to make the purchase for the corporation upon the best terms

obtainable, and, if, in disregard of their duty, they purchase for their individual account what they ought to purchase for the corporation, any profit obtained upon a subsequent resale to the corporation is, unless fully disclosed, wrongfully taken. An entirely different situation arises if the property sold to the corporation was acquired by the promoters before they entered upon any fiduciary relation to the corporation. They are, in such case, bound to disclose their interest in the property, but its cost to them is wholly immaterial, and while the transaction may, because of a failure to disclose the promoters' interest, be unlawful, the promoters have not, properly speaking, taken any secret profit."

Because the Plymouth Oil Company was not finally organized until after October 23d, the relation of the promoters to it, strictly speaking, perhaps, could not have been that of principal and agent, nor, for other reasons, could it, strictly speaking, have been that of trustee and *cestui que trust*, but if this contention be true a relation of that general character, and analogous to that of a director to a corporation, did, nevertheless, arise.

With respect to this question, *Ehrich on Promoters*, in *Section* 15, says:

"That the promoter may become such, and subject himself to the limitations of the fiduciary relation before the corporation achieves legal existence, is not open to doubt. It has been objected that a promoter cannot be an 'agent' for a nonexisting corporation, and there is a similar difficulty in calling him a 'trustee.' Lord Justice Lindley remarked in *Lydney v. Wigpool Iron Ore Co. v. Bird* 'that it is not much less objectionable to talk of his being in a fiduciary relation to the company before the company had any existence.' The difficulty is, however, merely one of terms for in all of these, and in numerous other cases, the fact that the fiduciary relation of the promoter can and does arise before the corporation had acquired existence, is fully conceded."

In *Arnold v. Searing*, 78 *N. J. Eq.* 146, 78 *A.* 762, the court said that the fiduciary relationship of the promoter of a corporation to the corporation is—

"an extension of the doctrine of agency, a sort of agency by anticipation, for the promoter is not, strictly speaking, an agent of or trustee for the company before incorporation, but it is a salutary and necessary fiction of equity for the protection of the company."

In *Woodbury Heights Land Co. v. Loudenslager*, 55 *N. J. Eq.* 78, 35 *A.* 436, the court said:

But if the contract was "entered into* * * on behalf of the future

company, under such circumstances that the company, when formed, could say that the purchase made * * * was made for the company, or if, at the time the actual purchase was made from White, Dr. Buck was a trustee, officer or agent of the company, he cannot be permitted to make any profit from the sale to the company."

In *Ladywell Mining Co. v. Brooks*, [1887] *L. R. 35 Ch. D.* 500, Cotton, Judge, in applying the test as to whether there was a fiduciary relation between the persons, who were claimed to be the promoters, and the corporation subsequently formed, said that, in order to establish that relation, the company must be entitled to say to the promoters:

"When you bought this mine, you were acting for us; this purchase, although made by you, is one that must be considered as having been made by you for the company which was afterwards formed at your invitation. If persons bought property in such a position it would be wrong for them, the original purchase having been made at a smaller price, to add to that price afterwards and to put in their own pockets a further sum of money for the purchase of that which from the very first had been the property of the company."

See, also, *Plaquemines Trop. Fruit Co. v. Buck*, 52 *N. J. Eq.* 219, 27 *A.* 1094; *Commonwealth S. S. Co. v. American Shipbldg. Co.*, (*D. C.*) 197 *F.* 797; *South Joplin Land Co. v. Case*, 104 *Mo.* 572, 16 *S. W.* 390.

The real principle involved in the above cases is shown more clearly by the following statement in *Ehrich on Promoters*, at *Section* 16:

"The purchaser does, it seems, enter upon the relation of promoter to the corporation, if he makes his purchase not for himself, but on behalf of the contemplated corporation. He will, at any rate, be held to have acted for the corporation in the transaction and be compelled to give to it, when formed, the full benefit of his purchase."

While the principle contended for by the appellants was conceded by the court below, and by the majority opinion, its application necessarily depends upon the facts in each particular case. *Ehrich on Promoters*, § 16.

As the language of the court below is quoted in the majority opinion, I will not repeat it here.

The burden is on the appellants to show facts that created a fiduciary relation between the Stearns group and the Plymouth

Oil Company on or prior to October 8, 1923. *Ehrich on Promoters*, § 17; *Ladywell Mfg. Co. v. Brooks*, [1887] *L. R.* 35 *Ch. D.* 400; *L. R.* 34 *Ch. D.* 398.

It is conceded that a mere intent, unaccompanied by definite acts to that end, on and prior to that date to form a corporation at a subsequent date, and to convey the property covered by the Pickrell contract to such corporation, would not be sufficient to create a fiduciary relation between the Stearns group and the corporation, when created. *Ehrich on Promoters*, § 16; *Yale Gas Stove Co. v. Wilcox*, 64 *Conn.* 101, 115, 29 *A.* 303, 25 *L. R. A.* 90, 42 *Am. St. Rep.* 159; *Old Dom. Copper Co. v. Bigelow*, 188 *Mass.* 315, 74 *N. E.* 653, 108 *Am. St. Rep.* 479; *Plaquemines Trop. Fruit Co. v. Buck*, 52 *N. J. Eq.* 219, 27 *A.* 1094; *New Sombrero Phosphate Co. v. Erlanger*, *L. R.* 5 *Ch. D.* 73; *Erlanger v. New Sombrero Phosphate Co.*, [1878] *L. R.* 3 *App. Cas.* 1218.

An examination of the record shows, however, that prior to the execution of the Pickrell contract, the Stearns group had taken the following definite steps, with respect to the creation of the Plymouth Oil Company:

1. They had agreed to organize at once both the Big Lake Oil Company and the Plymouth Oil Company.

2. The whole corporate structure of both corporations had been worked out. It had been agreed that the Big Lake Oil Company should have a capital of $2,000,000 which was later changed at the request of Pickrell to $4,000,000 and the Plymouth Oil Company a capitalization of $6,000,000. The capital stock of the latter company was to be divided into 150,000 shares of preferred stock and 1,050,000 shares of common stock, and each issue was to have a par value of $5 per share.

3. Hallanan had been agreed upon as president, Farquhar as treasurer and Hennen as a director of the Plymouth Oil Company, and the other directors had been, at least, tentatively agreed upon.

4. It had been agreed that the charter of the Plymouth Oil Company should contain a provision that the preferred stock, at the option of the holders thereof, could be exchanged for common stock of that company, and that 150,000 shares of the common stock should, therefore, be retained in the treasury of the company to secure that privilege.

5. That the Big Lake Oil Company was to be the operating company and the Plymouth Oil Company the holding company, and that title to the Texas property should first be taken in the name of Stearns, and then transferred to the Big Lake Oil Company in return for the issuance to Stearns of three-fourths of the capital stock of that company. The remaining stock was to be issued to Pickrell and his associates. It had been further agreed that Stearns would assign all of the stock of the Big Lake Oil Company, issued to him, to the Plymouth Oil Company, and that the Plymouth Oil Company would then issue all of its capital stock, with the exception of 150,000 shares of the common stock, necessary to be retained in the treasury to secure the conversion privileges above referred to, to Stearns.

6. It had been agreed that the preferred stock of the Plymouth Oil Company should be sold to raise the necessary capital to both purchase and develop the Pickrell property, and that the sale price should be $3 per share.

7. Various members of the promotion group had been requested to make an effort to secure subscriptions for the preferred stock of the Plymouth Oil Company, though that company had not then been organized, and had solicited such stock subscriptions from numerous persons.

8. It had been agreed and planned that the purchase price of the Pickrell property should not only be wholly paid for by the sale of stock of the Plymouth Oil Company, but that the promoters would retain 900,000 shares of the common stock as a profit on the transaction.

None of the above facts are disputed. In fact, it does not seem to be denied that every detail, except the preparation of the corporate charters and the actual organization of the contemplated corporations had been decided upon prior to October 8th.

The record further shows that directly after the execution of the Pickrell contract, the charters of both the Big Lake Oil and Plymouth Oil Companies were prepared, and the Big Lake Oil Company was actually organized on October 22, 1923, and the Plymouth Oil Company on October 23d of that year; that the conveyances by Stearns were carried out as planned; that the

money due on the subscriptions for $50,000, procured from Davenport and Laing October 20th, was actually paid on October 23d, and the respondents concede that it was applied to the purchase price of the Pickrell property; and in fact that the whole of the purchase price for the Pickrell property was paid from funds of the Plymouth Oil Company.

Another significant fact is that while, practically all of the promoters testified in the case, none of them testified that there was any intention to purchase the Pickrell property for their own individual accounts.

The reason for holding that a fiduciary relation exists between promoters and the corporation which they organize is that they create it, and, therefore, mould its organization and policies. *Old Dom. Copper Co. v. Bigelow*, 203 *Mass.* 159, 89 *N. E.* 193, 40 *L. R. A. (N. S.)* 314.

While there is, perhaps, no one decisive test of the moment at which the relation of promoters to a corporation is assumed (*Ehrich on Promoters*, § 15; *In re Olympia, Ltd.*, [1898] 2 *Ch. D.* 153, 181, 182, affirmed under the name of *Gluckstein v. Barnes*, [1900] *App. Cas.* 240) generally speaking that relation begins when they actually enter upon its formation or creation; when they take the first decisive steps to carry out their prior plans to create a corporation (*Ehrich on Promoters*, § 17; *Yeiser v. U. S. Board & Paper Co.,[C. C. A.]* 107 *F.* 340, 52 *L. R. A.* 724; *Densmore Oil Co. v. Densmore*, 64 *Pa.* 43).

As I view it, it is apparent from the above facts that the Pittsburgh group, who mainly composed the respondents in this case, not only did not stop with a mere vague intention to organize the Plymouth Oil Company, but prior to October 8, 1923, had taken numerous decisive steps to carry out that intent.

Further than that, as I have already stated, it is not denied that the whole of the purchase price of the Pickrell property was paid by the Plymouth Oil Company and by money furnished, in part, at least, by stock subscriptions made by the appellants.

While this fact, standing alone, may not be controlling, it is extremely important when considered in connection with the other facts in this case. *Ehrich on Promoters*, § 16, and cases hereinafter cited.

My conclusion, therefore, is that the Stearns group had become promoters of the Plymouth Oil Company prior to October 8, 1923, and were acting for that company when the Pickrell contract was executed; or, at any rate, by reason of the fiduciary relation existing between them and the Plymouth Oil Company, that the corporation was entitled to the benefit of the Pickrell contract and to the utmost good faith on the part of the Stearns group.

The retention of any secret and undisclosed profits by that group was, therefore, unlawful and constituted a fraud on the corporation.

The relation of promoter to a corporation has been held to exist in much weaker cases than this, but as I am only concerned with this particular case, it is sufficient to say that the authorities support the conclusions above stated. *In re Olympia, Ltd.*, [1898] 2 *Ch. D.* 153 (*affirmed under the name of Gluckstein v. Barnes*, [1900] *App. Cas.* 240); *Foss v. Harbottle*, 2 *Hare*, 461; *Pietsch v. Milbrath*, 123 *Wis.* 647, 101 *N. W.* 388, 102 *N. W.* 342, 68 *L. R. A.* 945, 107 *Am. St. Rep.* 1017; *Simons v. Vulcan Oil & Mining Co.*, 61 *Pa.* 202, 100 *Am. Dec.* 628; *Densmore Oil Co. v. Densmore*, 64 *Pa.* 43; *Burbank v. Dennis*, 101 *Cal.* 90, 35 *P.* 444; *Woodbury Heights Land Co. v. Loudenslager*, 55 *N. J. Eq.* 78, 35 *A.* 436; *Yeiser v. U. S. Board & Paper Co.*, (*C. C. A.*) 107 *F.* 340, 52 *L. R. A.* 724; *Central Trust Co. v. East Tenn. Land Co.*, (*C. C. A.*) 116 *F.* 743; *Plaquemines Trop. Fruit Co. v. Buck,* 52 *N. J. Eq.* 219, 27 *A.* 1094; *Hinkley v. Sac Oil & Pipe Line Co.*, 132 *Iowa*, 396, 107 *N. W.* 629, 119 *Am. St. Rep.* 564; *Ladywell Mfg. Co. v. Brooks*, [1887] *L. R. 35 Ch. D.* 400.

The appellees attempt to distinguish some of the above cases on the ground that they were not *quasi* agency cases, and also on the ground that actual misrepresentations were made by the promoters. But if a fiduciary relation existed, the principles involved would be the same, and it would not matter whether they were *quasi* agency cases or overvaluation cases, or whether there were concealments of facts which it was their duty to disclose, or actual misrepresentations of facts. Either would constitute fraud, and the method of committing the fraud in a particular case would not matter.

Having reached the conclusion that the facts above stated establish a fiduciary relation between the Stearns group and the Plymouth Oil Company, it is unnecessary for me to consider the effect of any representations alleged to have been made by Farquhar and others after October 23d, as to the amount of stock authorized and outstanding; nor is it necessary for me to consider the letter of March 1, 1924, sent to the stockholders of the Plymouth Oil Company, stating that that corporation had been organized to take over the Texas oil lands, and signed by certain officers of the corporation, who were also members of the promotion group.

The majority opinion does not expressly pass on, or even discuss, the so-called agency question, but the court below held that Stearns and the group for whom he was acting acted for themselves when they entered into the Pickrell contract of October 8, 1923, and not for the Plymouth Oil Company.

The Chancellor, apparently, based his conclusions on two grounds:

1. That Stearns and his associates had assumed definite obligations to Pickrell by the contract of October 8, 1923, and by the guarantees of such contract and the execution and endorsement of certain notes.

2. That the Plymouth Oil Company had not then been organized and that the Stearns group were not bound to organize that company and to convey the Pickrell property to it.

It is true that certain nominal obligations were assumed by Stearns and his associates when they executed the Pickrell contract, and the guarantees and notes given in connection therewith. From the very beginning, however, they had planned that these obligations should be met by the corporation when organized, and that they, individually, would not pay one cent thereon; and, pursuant to this plan, they had the Plymouth Oil Company assume all of such obligations the very day that it was organized. Further than that, as I have already pointed out, they had not only planned that this obligation should be met by the corporation, but even before the execution of the contract of October 8th had set to work soliciting subscriptions for the preferred stock of the corporation intended to be created.

But that is not all. They had even figured that the purchase price and cost of drilling the other wells referred to in the Pickrell contract would amount to approximately $450,000 and they planned that the preferred stock of the corporation should be sold for exactly that amount—that is to say, at $3 per share.

It may be true that the promoters were not bound to organize the Plymouth Oil Company, but the answer is that they did organize it, and that argument was rejected in *In re Olympia, Ltd.*, [1898] 2 *Ch. Div.* 153. This case was affirmed under the name of *Gluckstein v. Barnes*, [1900] *App. Cas.* 240, and the same principle was announced. See, also, *Simons v. Vulcan Oil & Mining Co.*, 61 *Pa.* 202, 100 *Am. Dec.* 628; *South Joplin Land Co. v. Case*, 104 *Mo.* 572, 16 *S. W.* 390.

As I have already stated, the appellants admit that the promoters disclosed the fact that they had retained a profit of 200,000 shares of its common stock on their transactions with the Plymouth Oil Company, but claim that they knew nothing whatever about the retention of the remaining 700,000 shares of such stock.

This contention is not specifically denied, though it is pointed out that the minutes of the Plymouth Oil Company show what was paid for the Pickrell property and what profits, in the way of stock, were retained by Stearns and his associates, but there is nothing to show that any of the appellants ever saw these minutes, or that they had any knowledge of the facts appearing therein when they bought their stock in that company.

Because of what appears in the books of the corporation, the respondents contend that the profits taken were not concealed. In support of this contention, they cite *Mason v. Carrothers*, 105 *Me.* 392, 74 *A.* 1030; *Burneagle Coal & Coke Co. v. Henritze*, 139 *Va.* 422, 124 *S. E.* 224; *St. L., etc., Ry. Co. v. Tiernan*, 37 *Kan.* 606, 15 *P.* 544; *Ehrich on Promotors*, § 112.

In this connection, Chancellor Wolcott, in *Cahall, Receiver, v. Burbage*, 13 *Del. Ch.* 303, 119 *A.* 576, aptly said:

"The failure of stockholders to examine the corporate records and books and thus acquire knowledge of the wrongful acts of the corporate officers and directors, is not to be attributed to their negligence, for they have a right to assume that the officers and directors will be faithful to their trust."

The same principle was announced by the then Chancellor in *Cahall, Receiver, v. Lofland, et al.*, 12 *Del. Ch.* 125, 107 *A.* 769. That case was affirmed by this court on appeal. 13 *Del. Ch.* 384, 118 *A.* 1.

In principle, so far as this state is concerned, this would seem to settle this contention.

Further than that, while apparently complete in every detail, it is not perfectly clear when these minutes became a part of the corporate records, as it is admitted that the details, with respect to the Pecos and Upton County properties, were not filled in at the time they purport to have been written in the books.

It is contended that there was, at any rate, no intentional concealment of the promoters' profits, but this is not an action for false representations, and that question would, therefore, seem to be wholly immaterial to this issue. *Ehrich on Promoters*, § 100.

As we have already seen, the burden of proof to show the existence of facts, creating a fiduciary relation between the Plymouth Oil Company and the Stearns group, rests upon the complainants below, the appellants in this court, but the burden of showing that the fiduciaries, when such relation is established, acted fairly with the corporation rests squarely on such fiduciaries. *Erlanger v. New Sombrero Phosp. Co.*, [1878] *L. R. App. Cas.* 1218.

But there are other important questions that must be considered in determining whether the appellants can recover in this action. The enormous block of stock in dispute, retained by the promoters, as a part of their profits in their transactions with the Plymouth Oil Company, represented a par value of $3,500,000 and was and is a corporate liability to that amount. It, therefore, affected the corporation and the value of every share of stock held by any original subscriber.

By reason of that fact, and because of the fiduciary relation existing between them, it may be stated as a general rule that promoters of a corporation have no right to retain any profits in any transactions with such corporation unless all persons who have subscribed for, and then own stock in it, have full knowledge of the facts and have either expressly or impliedly consented to the retention of such profits. *Old Dom. Copper Co. v. Bigelow*,

203 *Mass.* 159, 89 *N. E.* 193, 40 *L. R. A.* (*N. S.*) 314; *Old Dom. Copper Co. v. Lewisohn,* 210 *U. S.* 206, 28 *S. Ct.* 634, 52 *L. Ed.* 1025; *Davis v. Las Ovas Co.,* 227 *U. S.* 80, 33 *S. Ct.* 197, 57 *L. Ed.* 426; *Id.,* 35 *App. D. C.* 372. It may be further stated as a general rule that where undisclosed profits are retained, a court of equity will grant the appropriate relief in a bill filed by the corporation against the promoters who retained such profits. *Old Dom. Copper Co. v. Bigelow* and *Old Dom. Copper Co. v. Lewisohn,* and *Davis v. Las Ovas Co., supra.*

The same rule would also be applied even if the promotion group were then the only persons who owned stock and were, therefore, the only persons then interested in the corporation, if a further issue and sale to the public was then authorized and intended, and stock was issued and sold pursuant to that intent. *Ehrich on Promoters,* § 124; *Old Dom. Copper Co. v. Bigelow,* 203 *Mass.* 159, 89 *N. E.* 193, 40 *L. R. A.* (*N. S.*) 314; *Bigelow v. Old Dom. Copper Co.,* 74 *N. J. Eq.* 457, 71 *A.* 153; *In re Leeds and Hanley Theaters,* [1902] 2 *Ch. D.* 809; *Luganos Nitrate Co. v. Luganos Syndicate,* [1899] 2 *Ch. D.* 392; *Gluckstein v. Barnes,* [1900] *App. Cas.* 240; *In re Seamless Paper Box Co., L. R. Ch. D.* 467; *Plaquemines Trop. Fruit·Co. v. Buck,* 52 *N. J. Eq.* 219, 27 *A.* 1094; *Pietsch v. Milbrath,* 123 *Wis.* 647, 101 *N. W.* 388; 102 *N. W.* 342, 68 *L. R. A.* 945, 107 *Am. St. Rep.* 1017.

And the mere fact that the value of stock held by other persons, who might have assented to such profits, would be affected thereby does not affect this rule. *New Sombrero Phos. Co. v. Erlanger,* 5 *Ch. D.* 73, 3 *App. Cas.* 1218; *Davis v. Las Ovas Co.* 227 *U. S.* 80, 87, 33 *S. Ct.* 197, 57 *L. Ed.* 426.

It is conceded, however, that the rule last stated would not apply, and the corporation would have no right of action if the promoters, who organized it, intended when such profits were taken that they themselves should alone compose the corporation, as originally created, and, therefore, subscribed for all of the authorized issue of stock. *Old Dom. Copper Co. v. Bigelow,* 188 *Mass.* 315, 74 *N. E.* 653, 108 *Am. St. Rep.* 479; *Id.,* 203 *Mass.* 159, 89 *N. E.* 193, 40 *L. R. A.* (*N. S.*) 314; *Arnold v. Searing,* 73 *N. J. Eq.* 262, 67 *A.* 831; *Id.,* 78 *N. J. Eq.* 146, 78 *A.* 762.

In discussing this rule, *Ehrich on Promoters at Section* 121, says:

"In its final analysis, the basis of the rule just stated is the fundamental one, that the promoters' profits are lawful if disclosed to all the subscribers, and acquiesced in by them. There is, when all the shares are issued to the promoters, no one to complain, for all the original subscribers are parties to and have full knowledge of the transaction. All subsequent holders receive their shares directly or indirectly from the promoters, stand in their shoes, and are bound by their acquiescence."

*Section* 124 of the same work is to the same effect.

Before considering these questions any further, I shall consider the rights of the corporation from the standpoint of the Pecos and Upton County properties.

The record shows that Stearns had no rights whatever, in these properties when he contracted to assign rights therein to the Plymouth Oil Company on October 23, 1923.

And as I view the matter, the fact that he then hoped to acquire, and at a subsequent date did actually acquire, rights in those properties, while important as between Stearns and the corporation, cannot in a court of equity affect the rights of persons who subscribed for stock after October 23d, but before any such rights were actually acquired by the Plymouth Oil Company.

However that may be, as is pointed out both by the court below and the majority opinion, there is no evidence in the record to show what profits were retained by the promotors on these properties; and even if as contended by the appellants, the strict application of equitable principles throws the burden on the respondents to show that they acted fairly with the corporation, and that in the absence of such proof the relief asked for should be granted, I prefer not to consider that question, or to base any relief on that ground.

Returning to the main question, it is true that the Supreme Court of the United States in *Old Dom. Copper Co. v. Lewisohn*, 210 *U. S.* 206, 28 *S. Ct.* 634, 52 *L. Ed.* 1025, refused to allow any recovery in an action by a corporation against the promoters, where corporate action was based on the rights of subsequent, though originally contemplated subscribers for stock.

The court based its decision on the ground that there were no outside interests when the transaction complained of took place.

There were two questions involved in that case. One question was as to the rights of syndicate members between themselves, and the other was whether property purchased by the promoters, months before, with their own funds had been sold to the corporation which they controlled at an unfair price; and some seven years later, when the stock of the corporation must have been to some extent scattered, it was sought to hold Lewisohn alone responsible for all acts committed by his associates, as well as by himself.

The appellants contend that the *Lewisohn Case* has no bearing on this case because it was admitted in the brief filed by the attorneys for Lewisohn that the promoters would have been liable to the corporation if the property had been originally purchased with corporate funds.

That question was not involved in the case and was, therefore, not passed on. The court, however, apparently applied the technical rule that the identity of a corporation remains unchanged, though there may be changes in its membership; and as there was stock not held, by the promoters, which was intended to be issued to the public, this case may, therefore, support the contention of the respondents that there can be no right of action by the appellants because there were no other persons interested in the corporation on October 23d, with the possible exception of Davenport and Laing, who are not complainants.

Whether the Supreme Court would apply this rule in all cases, or whether it might in an appropriate case look behind the mere corporate entity, is not perfectly clear, but the court in this connection did say:

"We, at least shall require stronger equities than are shown by this bill to allow it [the corporation] to renew its claim at a later date because its internal constitution has changed."

In the same connection it also said:

"On the other hand, if we should undertake to look through fiction to facts, it appears to us that substantial justice would not be accomplished, but rather a great injustice done, if the corporation were allowed to disregard its previous assent in order to charge a single member with the whole results of a transaction to which $\frac{14}{15}$ of its stock were parties, for the benefit of the guilty, if there was guilt in any one, and the innocent alike."

From the above quotations, it may be doubted whether the Supreme Court meant to wipe out the old established rule in its entirety, or merely refused to look, behind the corporate entity in that particular case any further than to ascertain that, at the time the transaction complained of took place, no outside interests were involved.

The Supreme Court of Massachusetts, in a suit growing out of the same transaction, in the leading case of *Old Dominion Copper Co. v. Bigelow*, 203 *Mass.* 159, 89 *N. E.* 193, 40 *L. R. A.* (*N. S.*) 314, *supra*, analyzed the authorities at great length, and refused to follow the *Lewisohn Case*, either on reason or authority. The appellants also point out certain differences between the allegations in the bills filed in these cases, but as my conclusions are not based on the Pecos and Upton County properties, though they were acquired by the corporation after the appellants had purchased their stock, it seems unnecessary to consider them in this case. See *Bigelow v. Old. Dom. Copper Co.*, 74 *N. J. Eq.* 457, 71 *A.* 153; *Old Dom. Copper Co. v. Bigelow*, 203 *Mass.* 159, 89 *N. E.* 193, 40 *L. R. A.* (*N.S.*) 314; *Old Dom. Copper Co. v. Lewisohn*, (*C. C. A.*) 195 *F.* 637; *Old Dom. Copper Co. v. Lewisohn*, (*C. C. A.*) 202 *F.* 178.

While an analysis of the cases would not be helpful, *Mason v. Carrothers*, 105 *Me.* 392, 74 *A.* 1030; *Bigelow v. Old Dom. Copper Co.*, 74 *N. J. Eq.* 457, 71 *A.* 153; *Allenhurst Park Est. v. Smith*, (*N. J. Ch.*) 138 *A.* 709; *Victor Oil Co. v. Drum*, 184 *Cal.* 226, 193 *P.* 243; *Beal v. Smith*, 46 *Cal. App.* 271, 189 *P.* 341; *American Forging Co. v. Wiley*, 206 *Mich.* 664, 173 *N. W.* 515; *Meier v. Eaton*, 46 *S. D.* 286, 192 *N. W.* 721—apparently still adhere to the old established rule as laid down by the Massachusetts Court.

The Federal and Territorial Courts are necessarily bound by the *Lewisohn Case*. *Hughes v. Cadena De Cobre Mining Co.*, 13 *Ariz.* 52, 108 *P.* 231; *Ball v. Breed, etc.*, (*C. C. A.*) 294 *F.* 227; *Ball v. Chapman*, (*C. C. A.*) 1 *F.* (2d) 895; *American Shipbldg. Co. v. Commonwealth S. S. Co.*, (*C. C. A.*) 215 *F.* 296; *Old Dom. Copper Co. v. Lewisohn*, (*C. C. A.*) 202 *F.* 178; *Id.*, 229 *U. S.* 613, 33 *S. Ct.* 772, 57 *L. Ed.* 1352.

While the rights of syndicate members, only, were involved because of the facts the *Lewisohn Case* was distinguished and a

different conclusion was reached, in *Davis v. Las Ovas Co.*, 227 *U. S.* 80, 33 *S. Ct.* 197, 57 *L. Ed.* 426 (*Id.*, 35 *App. D. C.* 372).

Neither *Ball v. Breed, Ball v. Chapman*, nor *American Shipbldg. Co. v. Commonwealth S. S. Co.*, *supra*, is particularly helpful.

In both *Ball v. Breed* and *Ball v. Chapman*, however, it not only appeared that a prospectus issued by the promoters stated that they were taking a profit, but it also appeared that no outside stockholders were contemplated and that the promoters' stock was sold to the public.

In *American Shipbldg. Co. v. Commonwealth S. S. Co.* it also appeared that there were prior uninformed subscribers for stock, and both the *Bigelow* and *Lewisohn Cases* would therefore seem to apply.

The appellees claim that the *Lewisohn Case* was also approved in *Hoffman Motortruck Co. v. Erickson*, 124 *Minn.* 279, 144 *N. W.* 952; *Lilylands, etc., Co. v. Wood*, 56 *Cal.* 130, 136 *P.* 1026; *Hamilton v. Hamilton, etc., Co.*, 110 *Or.* 546, 223 *P.* 926; *Inland Nursery Co. v. Rice*, 57 *Wash.* 67, 106 *P.* 499; *Joe Vasey v. New Export Coal Co.*, 89 *W. Va.* 491, 109 *S. E.* 619; *Ringolsky v. Maud Mining Co.*, 262 *Mo.* 241, 171 *S. W.* 56; *Roberson v. Draney*, 53 *Utah*, 263, 178 *P.* 35.

But the courts in many of those cases, apparently, were not required, under the facts, to either approve or disapprove that case.

In *Hoffman v. Erickson*, the court, among other things, said:

"Nor is claim here made that any of the subsequent purchases of stock were without knowledge of the facts when they purchased, or were in any way deceived."

In *Hamilton v. Hamilton Mines Co.*, the promoters actually took all the stock and there was nothing to show any intent to sell any of it to the public; further than that, while it appears that there were subsequent sales by the promoters, the purchasers knew that they were buying from them, and not from the corporation. The court, therefore, relied on both the *Bigelow* and *Lewisohn Cases*.

In *Vasey v. New Export Coal Co.*, while the capital of the corporation was increased after its organization and stock was

ultimately sold to the public, the promoters had originally taken all of the authorized stock issue in return for the transfer of property owned by them, and there was nothing to indicate that any stock was originally intended to be sold to the public. This case would, therefore, seem to come directly within the principles announced in *Salomon v. Salomon & Co.*, [1897] *App. Cas.* 22, *In re British Seamless Paper Box Co.*, *L. R.* 17 *Ch. D.* 467, and the like.

While the *Lewisohn Case* was cited the court said, "But innocent subsequent purchasers of stock are not complaining as parties in this suit"; and it does not clearly appear that a distinction between the rights of the corporation and the individual stockholders was intended.

In *Ringolsky v. Maud Mining Co.* the Court said that:

"There was neither intent to sell nor sale of stock to third persons. There were no subscribers save the eight [meaning the promoters]."

They also said:

"This is not a case in which promoters have deceived their fellow incorporators or subsequent subscribers by misrepresenting or concealing the price of property delivered to a corporation they were forming."

In *Robertson v. Draney*, all of the stockholders apparently consented to the transaction. On page 272 (178 *P.* 38), the court said:

"The principal cases relied on by plaintiffs' counsel are [citing among others the Bigelow Case]. * * * Upon the whole, we are of the opinion that the better reason and the weight of authority are found in the cases cited by plaintiffs' counsel."

The facts in *Lilylands Co. v. Wood* are not perfectly clear, but while there was considerable discussion as to both the *Bigelow* and *Lewisohn Cases*, they would seem to indicate that all subsequent contemplated stockholders had consented to what had been done.

In, at least, some of the above cases the courts also call attention to the fact that the facts were more similar to the *Lewisohn* than to the *Bigelow Case*, and, therefore, apparently did not cite the *Lewisohn Case* to sustain the technical legal entity rule, that would apply to all cases and would prevent corporate

recovery where there were subsequent, though originally con-
templated, subscribers for stock.

The rule relied on by the appellants is a practical one in-
tended for the prevention of fraud and injustice. *Bigelow v. Old
Dom. Copper Co.*, 74 *N. J. Eq.* 457, 71 *A.* 153; *Allenhurst Park
Est. v. Smith*, (*N. J. Ch.*) 138 *A.* 709. While there may be isolated
cases where justice would not be done, if this rule be applied, if
the *Lewisohn Case* intended in all cases to apply the corporate
entity rule, though subsequent sales of authorized stock were
contemplated by the corporation, I prefer to adhere to the old
rule as laid down by the Massachusetts court, as being more
likely to prevent fraud.

As the court below based its conclusion on the value of the
property and not on the ground that the corporation had no right
of action in this case, the Chancellor must have been of the same
opinion.

While the Massachusetts case was an overvaluation, and not
a so-called agency case, so far as the right to sue is concerned,
the same principle is involved.

Judge Rugg, who delivered an exhaustive opinion setting
forth the views of the majority of the court, among other things
said:

"In this respect the question is one of intention of the promoters. If
they actually intend at the time the company is brought out to remain its
sole owners and that it shall not receive the money of innocent shareholders
in the future, then although thereafter the exigencies of the company may
be such as to require the issue of additional stock, they may not be responsible.
*In re British Seamless Paper Box Co.*, 17 *Ch. D.* 467, is an illustration of this
principle. There it was found that the promoters were and intended to re-
main the sole proprietors of the property of the company and the sole mem-
bers of the company. Cotton, L. J. at *p.* 479, said: 'Here it is an established
fact that when the company was formed, * * * it was intended to carry
it on without calling in the public, or issuing any shares except to the then
existing shareholders. Therefore the doctrine that directors may not take
a profit for themselves is inapplicable, because all the members knew that
they intended to make a profit. It is true that some new members were sub-
sequently taken in. If shortly after this transaction a prospectus had been
issued and the public had been invited to come in and take shares, no court
would have listened to directors who said that it was not intended to take
in fresh members. But this was commenced and carried on entirely as a

private company, and a considerable time, elapsed before they asked any one to join them.' "

Judge Rugg also said:

"The real ground of the decisions of which *Salomon v. Salomon* is a type is that the corporation is estopped by the circumstance that all persons with financial concern in the matter have assented with knowledge, and thus the lips of everybody are sealed. It is not that no wrong has been done, but that whatever wrong has been done has been condoned."

The theory applied by the Massachusetts court is that there is a fraud on the corporation, if property is conveyed to it at an overvaluation by the promoters who control it, but that a court of equity will disregard the corporate entity and refuse any remedy as long as the whole of its outstanding stock is held by the promotion group.

It further held, however, that a remedy will be granted to right the wrong previously done when originally contemplated stockholders subsequently subscribe for stock, even if the promoters had owned all of the stock that had been actually issued when the act complained of took place. This is shown by the quotations from the opinion of that court appearing in the majority opinion.

If the decision of the court in the *Lewisohn Case* was based on the fact that it would be inequitable to permit the corporation to recover in that particular case, I see no inequity in permitting a recovery in this case. If, as the promoters have from the outset strenuously contended the oil rights in question were worth anything like $5,250,000 on October 23d, as there had been no material change in conditions since October 8th, they ran no risk in assuming the obligations of the Pickrell contract. This was conceded by the court below, as well as by the majority opinion.

It is true that they procured the oil rights in question for the corporation, but they, at all times, expected it to pay for such rights with funds furnished by subsequent subscribers for its preferred stock. The complainants, who insist on litigating corporate rights, belong to that class, and the fact that promoters were instrumental in procuring such rights did not justify their retaining, as against such innocent contemplated subscribers,

profits in stock having a par value of $4,500,000 of what was, in effect, a total authorized capital stock of $5,250,000.

It is conceded that the retention of stock, having a par value of $1,000,000 was known to the complainants, but the remaining $3,500,000 was not known when they purchased their stock.

It was suggested in the brief of appellants that if the promoters were entitled to any compensation, in addition to the $1,000,000 disclosed, that they might have been allowed a reasonable amount for organizing the corporation. There is authority for such an allowance (*Mason v. Carrothers*, 105 *Me*. 392, 74 *A*. 1030: *Allenhurst Park Est. v. Smith*, [*N. J. Ch.*] 138 *A*. 709; *Bigelow v. Old Dom. Copper Co.*, 74 *N. J. Eq*. 496; 14 *C. J. Corporations*, § 332), but as it was not argued before us, I express no opinion on that question.

However that may be, if all subscribers for the preferred stock had been notified, before they purchased their stock, of what profits the promoters had retained, there could be no recovery against them in this action, but for obvious reasons the promoters preferred the indirect rather than the direct method.

The majority opinion states that the complainants did not take stock until the success of the corporation had been assured, but as I read the record it does not sustain this statement, as the success of the corporation does not seem to have become an assured fact until the early summer of 1924. In fact, it apparently did not get beyond the "wildcat" stage until well No. 9 was completed on June 20th of that year.

There is some evidence that the stock was being sold by those who owned it at a price of from $5 to $6 a share in March of 1924, but the reasons for such prices, apparently, do not appear. At any rate, my attention has not been called to its being due to the production of any other wells.

Some of the stock owned by the complainants was purchased as early as November 2, 1923, and numerous other purchases were made in January and February, to say nothing of March and May of 1924. Nor am I able to see that the fact that the appellants only purchased about twenty per cent. of the preferred stock issue affects their right to corporate recovery in this action.

It, apparently, does not appear who purchased the remainder

of that issue. While it appears that the whole issue was sold for approximately $453,000, it was apparently sold to the public and it is not contended that the Stearns group invested a single dollar in it, though it was almost wholly used to meet the purchase price of the Texas property and the other obligations of the Pickrell contract. At any rate, that group certainly invested no money in this stock in the formative or uncertain stage of the corporation.

It is true that the investment made by the appellants in the stock of the Plymouth Oil Company has been more than profitable, but that does not affect the principle involved or the equities of the case. See *Lagunas Nitrate Co. v. Lagunas Syndicate*, [1899] *L. R.* 2 *Ch. D.* 392, 442.

But even if the appellants are entitled to no special consideration by reason of the fortunate character of their investment of the stock in this company, this is a case of first impression in this state, and while largely a question of fact, it, nevertheless, involves certain legal principles which will have some bearing in governing the attitude of this court in subsequent cases. The conclusion reached by this court is, therefore, of much more importance than the mere controversy between the parties interested in this action, though the amount of money involved may be very large.

As I view it, the final solution of the question as to whether the appellants have a remedy in this case depends upon whether the Stearns group really intended that they should be the only persons interested in the Plymouth Oil Company, and to that end were to be the real subscribers for the whole of its authorized capital stock when it was organized; or whether the preferred stock was in effect sold to the appellants by the corporation as an original issue.

The record shows that prior to the execution of the Pickrell contract, the promotion group had agreed that all of the benefits as well as the obligations of that contract should be transferred to the Plymouth Oil Company. While it was, also, agreed that the preferred stock, as well as 900,000 shares of the common stock, should be issued to that group in return for the assignment of the stock of the Big Lake Oil Company, it was further agreed that the whole of the authorized preferred stock issue should be

turned back to a trustee for the Plymouth Oil Company, to be sold at $3 per share, to raise the necessary funds to meet the obligations of the Pickrell contract, and to supply working capital for that company.

Pursuant to this plan, when the Plymouth Oil Company was organized on October 23, 1923, a resolution passed on that date provided for the issuance of the preferred stock to Stearns, but at the same meeting a letter from Stearns bearing a previous date was presented which, in substance, stated that he understood it would be necessary to sell the preferred stock to raise the required capital to finance the corporation and offered to assign to it, or to a trustee to be named by it, the whole of the preferred stock issue, to be sold at such price as the corporation might fix. The corporation therefore designated Farquhar, its treasurer, trustee to sell such stock, and a trust agreement, providing for such sale, at such a price as the corporation should fix was executed by the Plymouth Oil Company and by Stearns and Farquhar on October 25, 1923.

The board of directors of the Plymouth Oil Company prescribed a sale price of $3 per share, and the stock was sold and all checks were made payable to the Plymouth Oil Company.

Stock subscriptions had already been solicited by Farquhar and others of the group, who organized the Plymouth Oil Company, and pursuant to such solicitations we have seen that Davenport and Laing had already subscribed for preferred stock to the amount of $50,000 on October 20th, and it is conceded that this amount was paid on October 23d, and applied to the purchase price of the Pickrell property; the first installment thereon being due November 6, 1923.

A court of equity will disregard mere form and consider the substance of a matter, and my conclusion from the above facts is that the Stearns group never intended that they, alone, should compose the corporation, by reason of being the real owner of all of the stock which it was then authorized to issue, and that their unlawful acts in this case have, therefore, not been condoned.

The preferred stock was never actually issued to them, and from the very first they had contemplated raising the necessary funds to pay for the Pickrell property, and to otherwise finance the

corporation by a sale of the preferred stock to the public, and there is nothing to indicate that such sale was to be made by them as individual owners. While they took certain steps in which they attempted to make it appear that they were the owners of the preferred stock, and therefore the only persons interested in the corporation, as I view it such steps were mere subterfuges, and it was, at all times, intended that the corporation should receive the benefit of the sale of that stock.

If that be true, no facts justifying the application of the law of estoppel against the appellants, because of their having required the stock indirectly from the promotion group, appear.

This conclusion seems not only to be supported by reason, but also by authority.

In *California-Calaveræ Mining Co. v. Walls*, 170 *Cal.* 285, 149 *P.* 595, the Court said:

"It is to be observed that by the antecedent oral agreement and understanding between Manson and the Chicago parties and by the terms of the written contract between them it was contemplated and intended that in the organization of the corporation future stockholders should be brought in; that treasury stock to the amount of 150,000 shares should be issued to Brown as trustee of the corporation to be sold to third parties for the benefit of the corporation at prices and terms set out in the contract, and another 150,000 shares were to be held by the corporation as a fund for its future use which of course, involved a right in the corporation to sell it to future stockholders. There were then 150,000 corporate shares which the agreement expressly provided should be sold to constitute future stockholders in the corporation and 150,000 shares additional subject to sale for such purpose; an aggregate of 300,000 shares or three-fifths of the capital stock of the corporation. Brown actually did sell a very large portion of this treasury stock pursuant to the agreement."

It also said:

"It is true that upon the organization of this corporation the form of the transaction respecting the transfer of the property to it was one between Manson as owner of all its stock and himself as having received in effect an option on the mining property transferred by him to it.

"The mere form * * * which the transaction between Manson and the corporation took may not be interposed to defeat what was the evident purpose and intent of all the parties interested in the organization of the corporation and the acquirement of the property by it."

With regard to certain parties who were equitable stock-

holders, as contrasted with other stockholders, the court further said:

"While nominally issued to Manson the stock was in reality acquired by him to a large extent for the benefit of his associates as intended stockholders with him in the corporation and" to a still larger extent "for the immediate benefit of the corporation as treasury stock to be sold to future stockholders."

While this case involved unissued stock, as well as stock that had been issued to the promoters, and pursuant to a prior plan, donated to the treasury of the corporation to be sold for corporate purposes, no distinction was made on that ground. *Yale Gas Stove Co. v. Wilcox*, 64 *Conn.* 101, 29 *A.* 303, 25 *L. R. A.* 90, 42 *Am. St. Rep.* 159, and *Anderson v. Johnson*, 45 *R. I.* 17, 119 *A.* 642, would seem to support this conclusion. See, also, *Ehrich on Promoters*, § 125, *Section* 14, *note* 60; *Pittsburgh Mining Co. v. Spooner*, 74 *Wis.* 307, 42 *N. W.* 259, 17 *Am. St. Rep.* 149; *Macey Co. v. Macey*, 143 *Mich.* 138, 106 *N. W.* 722, 5 *L. R. A.* (*N. S.*) 1036; *Hinkley v. Sac Oil, etc., Co.*, 132 *Iowa*, 396, 107 *N. W.* 629, 119 *Am. St. Rep.* 564; *Tilden v. Barber*, (*D. C.*) 268 *F.* 587; *American Forg. Co. v. Wiley*, 206 *Mich.* 664, 173 *N. W.* 515; *Lagunas Nitrate Co. v. Lagunas Syndicate*, [1899] 2 *Ch. D.* 392, 449.

It is true that some states have held that the purchase from the corporate treasury of stock that in accordance with the original plan has been taken by the promoters but immediately donated to the corporation to be sold for corporate purposes gives no rights to corporate action in a case of this character (*Ins. Press Co. v. Montauk Wire Co.*, 93 *N. Y. S.* 134, 103 *App. Div.* 472; see also *Soule v. Kunkle*, 71 *Colo.* 221, 205 *P.* 529; *Flagler Engraving Co. v. Flagler*, [*C. C. A.*] 19 *F.* 468), but as I view it, such cases overlook the basic principles upon which cases like *Salomon v. Salomon Co.*, [1897] *App. Cas.* 22; *Attorney Gen. v. Standard Trust Co. of New York*, [1911] *App. Cas.* 498; *In re British Seamless Paper Box Co.*, *L. R.* 17 *Ch. D.* 467, and the like, referred to in the *Bigelow Case*, 203 *Mass.* 159, 89 *N. E.* 193, 40 *L. R. A.* (*N. S.*) 314, are based, and substitute mere form for substance, and thereby not only encourage fraud, but defeat substantial rights.

While the principles laid down by the cases above referred to are well-established exceptions to the general rule, I see no reason for extending such exceptions to the extent of practically doing away with the rule regardless of the principles upon which such exceptions are based.

From the standpoint from which I have considered this case, the value of the property on October 23, 1923, has no bearing on the rights of the promoters, because a fiduciary is bound to purchase at the best price possible and has no right to retain any secret profits on his transactions with the corporation. Certainly, if the property conveyed was worth the money, and there was, therefore, consideration for the stock issued, no question as to the rights of any bona fide purchasers of the disputed stock from the promoters can be involved in this case. *Ehrich on Promoters*, §§ 165, 166.

I have already stated that the majority opinion does not consider the promotion or *quasi* agency theory. It does, however, consider the rights of the parties based on a fiduciary relation growing out of the fact that the Stearns group also composed the directors of the Plymouth Oil Company, and therefore, controlled its actions, when the oil rights in question were transferred to that corporation, at a valuation of $5,250,000. From this aspect of the case the majority of the court necessarily treated the Stearns group as owners and not as *quasi* agents.

With respect to this question, the appellants contend that a three-fourths interest in property which was purchased October 6, 1923, for approximately $450,000 without any material change in conditions, was not worth $5,250,000 on October 23, 1923, or only fifteen days later.

While the Pecos and Upton County properties were included in the valuation of October 23d, it is pointed out that the cost of the Upton County property was $1,920.

As I have previously stated, the cost of the Pecos County property does not appear, but it does appear that those properties had not been in any way developed on October 23d.

The majority of the court hold that the purchase price above named was reasonable. They base their conclusion on the ground

that the court below so found and that there was sufficient evidence to sustain that conclusion.

As my conclusions are based on entirely different grounds, it is not necessary for me to consider that question, or any other contentions made by the appellants.

It is intimated that any other conclusion than that the property was worth the agreed sale price would affect the validity of the stock issued to the promoters, even in the hands of bona fide purchasers from such promoters (*Const.* 1897, *art.* 9, § 3; *Sohland, Bankers' Mortg. Co., et al., v. Baker, et al.*, 15 *Del. Ch.* 431, 141 *A.* 22); whatever the result of such a conclusion might ordinarily be the prayers of this bill merely ask for the cancellation of stock standing in the name of the promoters, and for an account of the proceeds of any part of the disputed stock that may have been sold (*Cahall, Rec., v. Burbage*, 13 *Del. Ch.* 303, 119 *A.* 574) and there could, therefore, be no such result in this case.

When fraud has been committed it does not rest with the persons who have committed the wrong to select the remedy against them, and under the facts of this case I see no good reason why the stock which the promoters illegally issued to themselves, and which constitutes a tremendous corporate liability, should not be cancelled. *Ehrich on Promoters*, §§ 165, 166; *Hayward v. Leeson*, 176 *Mass.* 310, 57 *N. E.* 656, 49 *L. R. A.* 725; *Davis v. Las Ovas Co.*, 227 *U. S.* 80, 33 *S. Ct.* 197, 57 *L. Ed.* 426; *Yeiser v. U. S. Board & Paper Co.*, (*C. C. A.*) 107 *F.* 340, 52 *L. R. A.* 724.

For the reasons above given, my conclusion, therefore, is that the decree of the court below should be reversed.

A motion for reargument was made by the appellants and heard February 2, 1928.

PENNEWILL, C. J., delivering the opinion of the majority of the court:

The court have considered the reasons urged by complainants' counsel for a reargument of the above mentioned case.

It is not satisfactorily shown that any material fact was misconceived or not considered by the court; neither is it shown

that any principle of law applicable to the facts was misapplied or disregarded. The position of complainants' counsel is that they believe the decision to be erroneous and that if permitted to reargue the case, they will be able to convince the court of that fact.

There has perhaps never been in the courts of this State a case of more importance or one in which the printed and oral arguments were more thorough and complete. For two years the case has been in litigation here, and during that time two exceptionally able and elaborate arguments have been made before the Chancellor and one before this court. It is reasonable to believe the last word has been said on the subjects involved. No doubt every point that could be made and every authority that could be cited in support of any contention on either side has been made and cited. Such being the case, we think the final determination of the case should not be longer delayed. If the court were in doubt about the correctness of its decision, or there was any reason to believe it might be changed by a further argument, we would not hesitate to grant complainants' application. But we are not convinced by anything said in support of the present motion which was a reargument in brief, that another hearing could result in a different decision. The court is, therefore, constrained to refuse the application.

In disposing of the motion, we wish to refer very briefly to some observations made by counsel on certain language in the court's opinion, because we feel that the meaning of such language was misconceived. The reasons urged for a reargument were entirely oral; there were no reasons filed, but from our recollection of the argument, we think the criticism of the opinion related mainly to three points. It was contended:

1. That the court indicated that a promissory note bearing responsible endorsement and given in payment for a stock subscription is property within the meaning of the Constitution.

Certainly there is no basis for this contention. The only reference to "notes" is in that part of the opinion in which the court stated the reasons given by the Chancellor for his conclusion on the question of agency, viz.:

"Pickrell had Stearns' notes endorsed by certain of his associates. When many of these endorsements were made, not much risk of loss to the endorsers was incurred, but there is the fact of their existence which cannot be overlooked."

The Chancellor was not speaking of notes given to a company for stock, but notes given to an individual for his property. Obviously there is nothing in the language that warrants the construction placed upon it by counsel.

2. That the minutes of the company showing the profits the promoters received for their property were notice to future stockholders of such profits.

The only reason given for this contention is the following language of the opinion:

"Another fact, tending at least to rebut intentional concealment or misrepresentation by the promoters, is that the minutes of the company showed the Stearns-Pickrell contract, the profits made by the promoters, the total amount of stock issued to the promoters for their property, and other material facts."

This is far from saying that future stockholders are bound by whatever the minutes of the company may disclose. The court were not considering that question.

3. Exception was taken to the following language used by the court in the opinion:

"The complainants say it was their money that furnished the working capital and caused the success of the company. They did not furnish all the working capital or even the half of it, and besides they bought their stock at a time when the success of the company was assured and their investments safe."

This extract contains two statements of fact and counsel challenges the correctness of both of them.

They say the promoters did not furnish any of the working capital; the court have not said they did. It must be remembered that some of the outsiders who bought preferred stock, and in that way furnished working capital, were not complainants. Davenport and Laing, and others, who were large purchasers of preferred stock, are not complainants.

It appears from the record that prior to June, 1924, when the success of the company was unquestionably assured and well

known, the complainants had purchased 29,334 shares of preferred stock, costing $88,002. There were 150,000 shares of preferred stock and $450,000 was needed to fulfill the requirements of the Pickrell contract.

Did the complainants buy their stock at a time when the success of the company was assured and their investments safe?

None of the complainants subscribed for preferred stock until November 2, 1923. Davenport, who was a very important witness in the case, and who, together with his friend Laing, paid $50,000 for preferred stock on October 23, 1923, testified that before that date he went to Pittsburgh to look the situation over and became convinced that the proposition was a good one, mainly from the reports of the geologists and the known production of the well that had been brought in, and had held up in production for several months. This indicated to him that it was draining from a large pool of oil, and he thought one of the major pools of the continent had been discovered. He was so fully convinced and satisfied that he was willing to invest $25,000 in preferred stock and advised Laing to do the same. This was several weeks before any complainants invested. It is fair to believe from the testimony that when the first complainant bought preferred stock the known production of well No. 1 was so great and continuous as to make the success of the company reasonably certain and the preferred stock reasonably safe.

But, after all, these are only questions of fact relating to the equities of the case, and have no real bearing on its legal aspects.

Note: Because of illness Rice, J., did not sit in this case.